**R. A. VORHOF CONSTRUCTION COMPANY, a corporation, et al., Plaintiffs-Respondents,**

v.

**BLACK JACK FIRE PROTECTION DISTRICT, a corporation, et al., Defendants-Appellants.**

No. 33651.

St. Louis Court of Appeals, Missouri.

April 28, 1970.

Rehearing Denied May 28, 1970.

Paul G. Ochterbeck, Florissant, for defendants-appellants.

Robert P. Baine, Jr., Clayton, for plaintiffs-respondents.

WEIER, Commissioner.

Plaintiffs sought and obtained a declaration of invalidity with respect to an ordinance of the Black Jack Fire Protection District. The court also enjoined enforcement of the ordinance. Its judgment was premised on a determination that the ordinance was an unreasonable exercise of powers conferred upon the district. Unconstitutionality was not raised and the judgment did not rule on such an issue. The appeal is therefore properly before this court. Conner v. Herd, Mo., 442 S. W.2d 501, 502.

The Black Jack Fire Protection District is a corporate body organized in 1953 under the provisions of Chapter 321, RSMo 1959, V.A.M.S. It affords fire protection to a large area in north St. Louis County. According to Ferdinand Schladerbach, president of its board of directors, the district encompasses some 25 square miles and extends from New Halls Ferry Road on the west to U. S. Highway 67 on the east, and from the Missouri River on the north to Vorhof Drive on the south. When originally organized as a volunteer district in 1929, the area was largely rural. Now it is about one-half urban. The rate of growth in population has been rapid. One commercial area has been established and a major shopping center was under construction when the case was tried in 1968. Immediately west and adjoining the district, is the City of Florissant, which, according to the United States Census, experienced a population growth of 921.3% in the decade from 1950 to 1960.

On December 26, 1967, the district board of directors adopted Ordinance No. 13 which supplemented a prior ordinance, No. 12, by adding three sections. The first two sections are:

"*Section 11.* Neither wood shingles nor any other roof covering of wood or wooden materials shall be used anywhere within the boundaries of the Black Jack Fire Protection District.

"*Section 12.* Where wood shingles or shakes are used as exterior wall coverings they shall be backed up with a masonry wall no less than 6 inches in thickness anywhere within the boundaries of the Black Jack Fire Protection District."

The third section, No. 13, made February 1, 1968, the effective date and required that the two prior sections be applicable to all construction pursuant to building permits issued after that date.

In holding that the ordinance was unreasonable, the court below based its conclusion upon two findings. First, the district did not establish fire limits but treated all of the area of the district alike in applying its ordinance, even though one-half of the area is farm land. Second, the court found that Ordinance No. 12, which Ordinance No. 13 "attempted to amend", was an inspection ordinance and not an ordinance regulating construction and establishing building specifications. Thus, the court reasoned, the new ordinance changed the purpose of the original ordinance. Going on in its memorandum opinion, the court says the amending ordinance falls "far short of the certainty and definiteness required in an ordinance intended to regulate and control the construction, repair, alteration, wrecking, moving and dismantling of buildings within the limits of the Fire District required to constitute it a valid exercise of the police power."

Defendants contend that the evidence did not show the defendant fire district had

abused its power to regulate and control the construction of buildings by prohibiting the use of wood shingles and shakes for roof coverings or prescribing masonry walls to back shingle or shake trim. In support of this contention they say the evidence was contrary to the court's findings referred to above and that Ordinance No. 13 was a reasonable exercise of the powers of the district. Further, that the pertinent inquiry which must be made by the court was whether the legislative body had before it facts at the time it took action which could make the issues debatable. If the evidence showed such a state of facts, then, defendants contend, the action of the board in its resolution of the problem is conclusive and the court cannot substitute its opinion for that of the board. We therefore review the evidence to test the contentions of the defendants.

Three corporate plaintiffs were builders and subdividers of land actively engaged in business in the fire district. One of these, R. A. Vorhof Construction Company, was engaged in the development of Whitney-Chase subdivision. It extended about a mile east of Old Halls Ferry Road and contained 358 lots for dwellings. The lots would average in dimension about 75 feet by 125 to 140 feet. The building line on the side of each lot is established at six feet by county zoning ordinance. Whitney-Chase North is another subdivision in which this plaintiff was interested in constructing houses. It also participated with others in the construction of dwellings in Ridge Manor, a subdivision also located within the district. One display home has a wood shingle roof. Roofs covered with cedar wood shingles and shakes had been offered as optional items to customers. Fireplaces were also offered as an optional item.

Alfred H. Mayer Company, another plaintiff, expected that 900 homes would be constructed in Paddock Forest, a subdivision located in the district. The Mayer company was building a shopping center on a tract of approximately ten acres. At the time of the passage of Ordinance No. 13, the company had designed and was in the process of constructing a house with a cedar shake mansard type roof. This design had to be revised to conform with the ordinance.

Milton Duenke of the Vorhof-Duenke Company, the third corporate plaintiff, said that his company had developed and was developing residential subdivisions in the district. Some of these were Calavera with 42 lots, Hathaway 7 Hills with 546 lots and Hathaway Trails with 399 lots. On some of the model houses, this company offers a cedar wood shake roof. Of seventy-five houses sold at the time of trial, about twenty-five per cent were to be constructed with shakes on some portion of the roof. Also planned in some of these subdivisions were many apartment buildings with eight to twelve apartments in each unit.

The remaining plaintiff was Julius Seidel, who, as an individual proprietor, engaged in the distribution and sale of roofing and siding material. He had agreed with Vorhof Construction Company to supply it with some wood shingles. In this, he was prevented by the passage of the ordinance.

Three additional witnesses were called by plaintiff and testified. One was an architect who had designed houses using wood shingles and shakes. He had found those made of red cedar to be durable, resistant to wind, and with good insulation qualities. Another witness was a representative of the Red Cedar Shingle and Handsplit Shake Bureau of Seattle, Washington. This is a trade association which represents the majority of the shingle and shake manufacturers in the northwestern part of the United States and the western part of Canada. His work was mainly to promote the sale and use of red cedar shingles and shakes. He had worked closely with associations of fire chiefs in southern California but had never seen a wood shingle roof burn. After the Bel Air (Califor-

nia) fire in 1961 when more than 400 homes were destroyed, he had employed a firm to make a survey of the area. This disclosed that about 58 per cent of the homes had wood roofs before the fire and about the same percentage of those that burned had wood roofs. Everything in the path of this brush fire was destroyed. The witness had never had any special training in fire protection and had never made a study of the subject.

The last witness produced by plaintiffs was Rex Walker, a building code consultant for the National Forest Products Association. This association has sixteen members who are largely lumber manufacturers and it disseminates technical information to engineers and architects on the use of wood. Previous to this employment he had been a building commissioner for municipalities in Illinois and Minnesota. His primary duties with the association were to gather statistics and data and to suggest changes to municipalities, fire protection districts and state legislatures with respect to building codes. The particular building code that he was charged with as an industrial advisor was the Basic Building Code of the Building Officials Conference of America, Inc. According to the witness, this was an association of building officials from various parts of the country. Periodic open and public meetings of the association with respect to changes or amendments of the code were attended by Mr. Walker, who would present data and recommendations.

In addition to the code referred to above, the witness claimed to have an extensive knowledge of other model building codes including those provisions with respect to fire protection and prevention. Furthermore, whenever an important fire or a catastrophe occurred in the upper mid-west area of this country it was his duty to investigate on behalf of his employer and determine the cause to the best of his knowledge. At the time of the hearing he was a member of the fire safety committee of the Joint Committee of Accreditation of Hospitals which was engaged in setting up standards of fire safety for hospitals. Based upon his knowledge, training and experience, he was of the opinion that cedar wood shingles or shakes properly applied would not constitute a fire hazard.

Appearing on behalf of the defendant fire district and the defendant members of the board of directors of the district were three witnesses who had had some experience with the combustibility of wood shingles. Ferd A. Hartwig, secretary and member of the board, had been on the board of directors since 1953. Before this he had been a member of the volunteer fire department since 1933. He had seen a very small fire on a wood shingle roof in the district in 1963. This had been caused by a spark from a chimney on the house where the fire started.

John T. Nansen, fire marshal of the Creve Coeur Fire Protection District, was a veteran fireman with many years experience both as a volunteer and paid fireman. He had been a member of the National Fire Protection Association and had attended numerous fire schools. On occasions he had witnessed wood shingle fires and had observed that they burned rapidly and gave off burning brands and debris. He was of the opinion that wood shakes and shingles were a fire hazard.

Ralph E. Wehmer was a member of the board of directors and treasurer of the fire district. In 1930 he had witnessed a wood shingle fire on an old residence. Sparks from the fire had carried a distance of 300 to 500 feet and had burned spots in the grass that distance away. He had considered his past experience when the ordinance was passed by the board.

Five building codes were accepted in evidence. Aside from the Basic Building Code (Fourth Edition, 1965), they included the National Building Code (1967 Edition) of the American Insurance Association, the Southern Standard Building Code (1965 Edition) of the Southern Building Code

Congress, the Uniform Building Code (1964 Edition, Vol. 1) of the International Conference of Building Officials, and the National Fire Codes, Volume 4, (1967–68 Edition) of the National Fire Protection Association. Additional importance must be given certain of these codes because of a reference to them in one of the sections of Ordinance No. 12 of the fire district before its amendment. In this section the Abridged Building Code 4th Edition, 1965, and the Basic Building Code of the Building Officials Conference of America, Inc., 4th Edition, 1965, and the supplements thereto, and the various standards published by the National Board of Fire Underwriters and the National Fire Protection Association were required to be deemed the generally accepted good practices for the construction and equipment of buildings, for fire protection and life safety in the district. The rules and regulations of the Abridged Building Code and Basic Building Code and the National Fire Code were adopted to supplement the rules and regulations set forth in the ordinance, and, by reference, were made a part of the rules and regulations of the district.

Extensive reading and reference to these building codes, both on direct and cross-examination, revealed that wood shingles and shakes received the lowest classification with regard to fire resistance qualities and were only permitted in territory outside the so-called fire limits or in the areas classified as having the least hazard of spreading fire, such as scattered residential, rural or farm areas. Even there the wood roofing materials were frequently limited to buildings of one or two stories in height. One code, the National Fire Code of the National Fire Protection Association, recommended a roofing ordinance (National Fire Codes, Vol. 4, 1967–1968, p. 203–4) which forbids the use of wood shingles for new roof coverings.

As previously stated, the trial court based its judgment upon two findings. Addressing ourself to the first, we find that the court concluded the ordinance to be unreasonable, because the district did not establish fire limits in which the ordinance would be applicable but rather prohibited wood shingle and shake roofing in the entire district.

Touching upon this matter of the term "fire limits", Mr. Rex Walker, expert witness for the plaintiffs, defined them as geographical districts which were established by government agencies within which certain requirements and regulations were imposed. For example, fire limits "one" normally would be a congested, high-value area. Limits "two" would be a buffer zone around the highly-congested area. Limits "three" would usually be the greater part of the city and the major part of the construction therein would be residential. Quoting the witness, "Well, fire limits actually protect a high value area. For example, if you were starting out with bare ground. A fire limits was established to blanket a city with a more restrictive requirement than the building code, as a rule. The reason they did this was because the cities existed prior to good modern building codes. Now, if you build a city out here on the prairie with this code, conform to all the portions of the code, you wouldn't have any need of the fire limits."

Obviously, if wood shingles and shakes are barred as a roofing material in the entire district, then it would follow there would be no reason to create limits within which the material could not be used. This fire protection district is obviously one which is experiencing rapid growth in the number of residential additions and communities. With such an increase in construction and with the units in close proximity, it would seem more than reasonable, in fact necessary, that high safety standards be imposed upon the builders and owners for the protection of people occupying the new dwellings. It would certainly be much better to do this in advance of large capital investment rather than wait until the need becomes pressing and then impose regulation and penalties. Delay could cause unreasonable expense to

the property owner in conformity alteration and an unnecessary exposure to hazard on the part of the occupier of premises. The reasoning of the court in restricting the operation of the ordinance to certain limits is not valid.

Turning now to the second basis for holding the ordinance to be an unreasonable exercise of the district's powers, the court relies on a finding that Ordinance No. 13 is an amendment of Ordinance No. 12. The court further finds that Ordinance No. 12 is an inspection ordinance and that it does not purport to be "an ordinance specifying the building specifications and requirements for the control and regulation of the construction, repair, alteration, wrecking, moving and dismantling of buildings" within the district. A reading of the title of Ordinance No. 12, however, commences with the words "An Ordinance Providing for the Elimination of Fire Hazards * * *." The ordinance as originally written and remaining unchanged after amendment, provides not only for periodic inspections of buildings and premises other than dwellings, but it also requires in Section 8 that certain codes and standards heretofore referred to "shall be deemed the generally accepted good practices for the construction and equipment of buildings and for fire protection and life safety." It further adopts these codes as part of the rules and regulations of the district. Therefore, it can hardly be said that Ordinance No. 12 is an inspection ordinance and does not purport to regulate and control building construction.

Are there any other grounds not set forth in the judgment upon which it might be affirmed? We think not. Plaintiffs urge that the district in prohibiting wooden-roof buildings is acting in excess of its power limited by Sec. 321.220, RSMo 1959,

V.A.M.S. They assert that this section gives authority to the district to adopt and amend ordinances for fire protection and fire prevention but it does not have the right to declare roofing made of wood a fire hazard. They liken this to the cases where a city ordinance has prohibited the operation of a business, such as a slaughter house (State ex rel. Jack Frost Abattoirs, Inc. v. Steinbach, Mo.App., 274 S.W.2d 588), or the raising of hogs within the city (Kays v. City of Versailles, 244 Mo.App. 178, 22 S.W.2d 182). In such cases the courts have held that a municipal corporation does not have the power to declare that to be a nuisance which is not a nuisance per se or declared so by statute.

We are not concerned here with a nuisance case. We are dealing with a building regulation established by ordinance of a fire protection district. This court has already decided that a fire protection district such as the defendant district, organized under Chapter 321, RSMo 1959, V.A.M.S., is endowed with police powers in the field of fire prevention. Community Fire Protection Dist. of St. Louis County v. Board of Education of Pattonville Cons. School Dist. R–3, Mo.App., 315 S.W.2d 873, 877. Being thus endowed, its powers in this field by reason of State legislative delegation are pre-eminent and must prevail over a school district as in *Community* or over a municipality as in Wellston Fire Protection Dist. of St. Louis County v. State Bank & Trust Co. of Wellston, Mo.App., 282 S.W.2d 171, 176.

The exercise of the police power by the district is subject to constitutional guarantees, none of which have here been urged or found to have been violated, and by limitations imposed upon governmental overreach which courts presently refer to as standards of fairness and reasonableness.[1]

---

1. In a discussion of reasons for determination of the unlawfulness of land use control, David M. Becker, in "The Police Power and Minimum Lot Size Zoning", 1969 Washington University Law Quarterly, 263,271, finds them to be: "* * * (1) the regulation has as its purpose an objective for which the police power ought not to be exercised; (2) it may operate unfairly and arbitrarily as to the particu-

█ In the determination of the question of reasonableness or unreasonableness as applied to ordinances having for their purpose the regulation of building construction to reduce or eliminate the hazard of fire, Bellerive Investment Co. v. Kansas City, 321 Mo. 969, 13 S.W.2d 628, 638 [15–19], lays down the rule that the answer must be found in the purpose and object of the ordinance and the dangers and hazards to society or humanity at large at which it is directed, as disclosed either upon the face of the ordinance or by evidence aliunde. Regard must be given to the circumstances of the case, the evils, dangers or hazards at which it is directed and the necessity which exists for the regulation. A presumption as to reasonableness exists and every intendment is to be made in its favor. And unless the unreasonableness appears upon its face, the burden of proving unreasonableness of the ordinance rests upon the person asserting it. The court further points out that where the unreasonableness or arbitrariness of an ordinance is fairly debatable, the court will not substitute its own judgment for that of the legislative body charged with the primary duty and responsibility of determining the question.

█ In the instant case sufficient facts existed at the time of enactment of the ordinance as is shown by the evidence to make the question of prohibiting wood shingles or shakes in the district fairly debatable. On one hand, statistics show a low rate of fires originating on roofs in the past few years. Elimination of solid fuels and increased efficiency of fire fighting equipment with better trained personnel may hold down the danger of wood shingle fires. In the far west and southwest, wood continues to be a major material used for roof coverings. In the opinion of plaintiffs' expert witness wood shakes and shingles were not hazardous. But on the other hand, the publication of the National Fire Protection Association, Volume 4 of the National Fire Codes (1967–68), emphasized the hazard of wood shingles. Quoting page 203–3, "Wooden shingle roofs are a menace to property, and have repeatedly demonstrated their hazardous nature as conflagration breeders." Since fireplaces were being offered to purchasers of new homes in the district, the use of solid fuels could be anticipated. The use of wood as a fuel by man goes back into prehistoric times, and its combustible nature, when dry, is part of man's ancient lore and knowledge. Defendants' expert had witnessed wood shingle fires and in his opinion, wood shingles were hazardous. With such a diversity of fact and opinion, the court must not substitute its judgment for that of the legislative body unless it appears that the conclusion of the body is clearly arbitrary and unreasonable. Desloge v. St. Louis County, Mo., 431 S.W.2d 126, 131[3–6]; Appelbaum v. St. Louis County, Mo., 451 S.W.2d 107 (Feb. 9, 1970). Here, we must defer to the conclusion of the board of directors of the fire district.

Because our ruling disposes of the case favorably to defendants on the merits under the pleadings and evidence before the court, we will not rule on complaints made by defendants as to the lower court's rulings concerning the pleadings and the refusal to admit certain evidence.

The remaining issue concerns the action of the trial court in denying defendants' motion to furnish an additional injunction bond to guarantee payment of damages and costs. Initially, when the court issued its order to show cause, bond was set in the sum of $500.00. Thereafter, on March 15, 1968, before the final submission of the case and judgment of the court, upon motion of the defendants the bond was increased to the amount requested, that is, $2,500.00. Judgment granting a permanent injunction was rendered on August 15,

lar landowner; or (3) private options may be so diminished and the attributes of ownership so substantially affected that the public goal can properly be attained by compensation only—in simple terms *too much has been taken*."

1968. Then, defendants, on August 28, 1968, filed a motion to compel plaintiffs to file an additional injunction bond in the amount of $4,500.00.

Civil Rule 92.09, V.A.M.R. (formerly Section 526.070, RSMo 1959, V.A.M.S.) provides: "No injunction or restraining order, *unless on final hearing or judgment*, shall issue in any case, except in suits instituted by the state in its own behalf, until the plaintiff, or some responsible person for him, shall have executed a bond with sufficient surety or sureties to the other party, in such sum as the court or judge shall deem sufficient to secure the amount or other matter to be enjoined, and all damages that may be occasioned by such injunction or restraining order to the parties enjoined, or to any party interested in the subject matter of the controversy, conditioned that the plaintiff will abide by the decision which shall be made thereon, and pay all sums of money, damages and costs that shall be adjudged against him if the injunction or restraining order shall be dissolved." (Our emphasis).

Under common law no liability was incurred by a plaintiff who in good faith sought and obtained an injunction. In 1835 the legislature passed what are now sections 526.070, 526.200 and 526.210, RSMo 1959, V.A.M.S. (Civil Rules 92.09, 92.11 and 92.12, V.A.M.R.) to require a bond as a condition to the issuance of a temporary injunction and procedure for assessment of damages if the injunction was dissolved. Hamilton v. Hecht, Mo.App., 299 S.W.2d 577, 579[4]. In *Hamilton* we construed Section 526.070 (Civil Rule 92.-09) to require the posting of a bond in such sums as the court would then believe to be enough to secure payment of all damages as might thereafter be adjudged against the plaintiff. The bond is not a general declaration of liability for all damages and costs which might arise after the granting of the temporary injunction but recovery is limited to the amount of the bond. Hamilton v. Hecht, supra, l. c. 579[1–3]. After a final decree has been rendered and a permanent injunction issued, a defendant cannot require that plaintiff be required to give an additional bond. Davidson v. Hough, 165 Mo. 561, 65 S.W. 731, 734[3]. The trial court therefore did not err in refusing to grant defendants an additional bond after its final judgment was rendered. Defendants must anticipate all damages and costs in their motions to fix the amount of the bond prior to the issuance of the permanent injunction.

The judgment of the court below heretofore entered on August 15, 1968, as amended on November 21, 1968, is reversed and the injunction dissolved. The order of the court denying defendants' motion to compel plaintiffs to file an additional injunction bond in the sum of $4,500.00, is affirmed. The case is remanded for further proceedings to assess damages and costs, which may be adjudged against plaintiffs on the bond of $2,500.00 approved and filed April 29, 1968, in accordance with Civil Rules 92.11 and 92.12, V.A.M.R.

PER CURIAM.

The foregoing opinion by WEIER, C., is adopted as the opinion of this Court. Accordingly, the judgment of the court below heretofore entered on August 15, 1968, as amended on November 21, 1968, is reversed and the injunction dissolved. The order of the court denying defendants' motion to compel plaintiffs to file an additional injunction bond in the sum of $4,-500.00, is affirmed. The case is remanded for further proceedings to assess damages and costs, which may be adjudged against plaintiffs on the bond of $2,500.00 approved and filed April 29, 1968, in accordance with Civil Rules 92.11 and 92.12, V.A.M.R.

WOLFE, P. J., and BRADY and DOWD, JJ., concur.