**DILLINGHAM CORPORATION dba Hawaiian Dredging & Construction, a Hawaii corporation, Plaintiff,**

v.

**UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, LOCAL 745, AFL–CIO, Defendant.**

Civ. No. 81–0238.

United States District Court,
D. Hawaii.

Aug. 3, 1981.

Robert S. Katz, Barry W. Marr, Honolulu, Hawaii, for plaintiff.

Dennis W. S. Chang, Gordon Miwa, Honolulu, Hawaii, for defendant.

## ORDER DENYING MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION

HEEN, District Judge.

Plaintiff has filed this action under Section 301(a) of the National Labor Relations Act, as amended, 29 U.S.C. § 185(a),[1] and seeks to enjoin Defendant Union from engaging in or threatening to engage in a refusal to work or taking other action against Plaintiff resulting from an alleged dispute under a collective bargaining agreement, and for damages. Plaintiff's Motion for Temporary Restraining Order was heard on July 10, 1981, and was denied. Plaintiff's requests for preliminary and permanent injunction were combined and heard on July 21 and 23, 1981. At the conclusion of that hearing, a Temporary Restraining Order was issued and decision on the requests for injunction was taken under advisement.

Plaintiff is a Hawaii corporation operating as a general contractor in the construction industry in the State of Hawaii and elsewhere. Defendant is a labor organization representing and acting for employee members in the State of Hawaii. The National Labor Relations Act clearly is applicable to the parties and their activities. 29 U.S.C. §§ 152(2), (5), (6), (7).[2] This Court has jurisdiction under that act and under 28 U.S.C. §§ 1331 and 1391.

Plaintiff is a member of the General Contractors Labor Association (hereafter "GCLA") and an associate member of the Gypsum Drywall Contractors of Hawaii. Plaintiff was, during 1980, covered by a collective bargaining agreement[3] between the Defendant and the GCLA by virtue of being a member of that organization.[4] In

---

1. 29 U.S.C. § 185(a) provides:

   Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organization, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

2. 29 U.S.C. §§ 152(2), (5), (6), (7) provides:

   (2) The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any corporation or association operating a hospital, if not part of the net earnings inures to the benefit of any private shareholder or individual, or any person subject to the Railway Labor Act, as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

   (5) The term "labor organization: means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

   (6) The term "commerce" means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

   (7) The term "affecting commerce" means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce.

3. Master Agreement covering carpenters in the State of Hawaii between UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL 745, AFL–CIO and GENERAL CONTRACTORS LABOR ASSOCIATION and LABOR ASSOCIATION OF THE HOME BUILDERS ASSOCIATION OF HAWAII and CERTAIN OTHER EMPLOYERS, effective to and including September 1, 1980.

4. NOW, THEREFORE, this agreement is made and entered into by and between the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL 745, AFL–CIO (hereinafter referred to as the "Union") and the GENERAL CONTRACTORS LABOR ASSOCIATION and the LABOR ASSOCIATION OF THE HOME BUILDERS ASSOCIATION OF HAWAII (each of whom is hereinafter referred to as the "Association") for and on behalf of those persons, firms, or corporations that, at the time of the execution of this Agreement are, or who during the term hereof

addition Plaintiff was covered by a collective bargaining agreement between Defendant and the Gypsum Drywall Contractors of Hawaii.[5] In this latter agreement, however, Plaintiff was not a member of the association but had separately signed the identical agreement with Defendant. Both agreements were automatically renewable from year to year after September 1, 1980, unless either party gave written notice of its desire to modify, amend or terminate. Both also provided that the written notice was to be rendered not less than sixty (60) nor more than ninety (90) calendar days prior to the expiration date and, in the event such notice was given, negotiations for a new agreement were to commence within ten (10) days after the notice was received by the other party. The agreements also established grievance and arbitration procedures, and included a no-strike clause.

In a letter to Plaintiff dated June 20, 1980, Walter H. Kupau, financial secretary and business representative for the Union, wrote:

June 20, 1980

Gentlemen:

Pursuant to Section 1 of the Collective Bargaining Agreement currently in effect between your company and this Organization and which expires on September 1, 1980, you are herewith, notified of our desire to modify and amend said Agreement.

Also pursuant to said Agreement, we request that you meet with our representative within ten (10) days' from the above date, so that we may begin to discuss certain amendments and modifications.

Please contact this office, immediately, so that arrangements can be made.

Very truly yours,
UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL 745, AFL–CIO
WALTER H. KUPAU
Financial Secretary
Business Representative

Subsequently, Defendant negotiated new agreements with both the GCLA and the Drywall Contractors effective September 1, 1980. Plaintiff is covered by the GCLA agreement, again, by virtue of membership in GCLA. Plaintiff has not signed the new Drywall Contractors agreement.

Plaintiff considered the June 20, 1980 letter to refer only to the GCLA agreement while Defendant considered that the letter referred to both agreements. Although both parties disagreed on the question whether the Drywall agreement had been automatically renewed, Plaintiff continued to request and Defendant continued to furnish carpenters for drywall work until on or about July 6, 1981. Plaintiff maintains that the agreement had been renewed automatically by its provisions, although there is evidence that Plaintiff realized it was in a somewhat precarious position and may have made some statements indicating recognition that it did not have an agreement with Defendant for drywall workers.

Defendant has consistently maintained that its letter of June 20, 1980, was notice under the terms of both contracts and, therefore, the Drywall agreement was not automatically renewed and in fact was terminated on September 1, 1980. Beginning July 6, 1981, Defendant refused to refer carpenters to Plaintiff, and apparently will

---

become members of said Association (each such member of which is hereinafter referred to as "Contractor") and ANY OTHER PERSON, FIRM CORPORATION OR OTHER ENTITY THAT BECOMES SIGNATORY HERETO (each such signatory also being hereinafter referred to as "Contractor"). GCLA Master Agreement, p. 3.

5. Master Agreement covering Drywall and Acoustical Applicators in the State of Hawaii between UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL 745, AFL–CIO and GYPSUM DRYWALL CONTRACTORS OF HAWAII, effective to and including September 1, 1980.

continue to do so, and on occasion has picketed Plaintiff's construction sites.

Plaintiff contends that because the parties differ on the question whether or not the June 20, 1980 letter in fact terminated the Drywall agreement the matter should be submitted to arbitration pursuant to the agreement and that Defendant's refusal to furnish men to Plaintiff is in violation of the no-strike provision. If the letter did not terminate the agreement on September 1, 1980, then the Union's refusal to refer men clearly would be in violation of the no-strike provision.

The fundamental question involved is whether or not the nature of the letter is an arbitrable question. If so, this Court clearly has authority to issue an injunction pursuant to the ruling of the United States Supreme Court in *Boys Market v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). Plaintiff argues that the grievance procedure and arbitration clause is broad enough to include any and all disputes between contractor and union and that, therefore, the question of the nature of the letter is arbitrable. Plaintiff must advance this argument because the letter bears a date which is clearly within the period established by the agreement for the giving of notice.[6]

Plaintiff relies heavily on the case of *Rochdale Village, Inc. v. Public Service Employees Union, Local 80, International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America*, 605 F.2d 1290 (2nd Cir. 1979). In that case the Court states that generally the question of contract termination is for the Court rather than the arbitrator. However, if the Court finds the parties have adopted a broad arbitration clause and have agreed to submit to arbitration disputes "of any na-

ture or character" or, "any and all disputes," termination is properly a question for the arbitrator. On the other hand, if the arbitration clause is narrower in nature, the Court may properly consider the question whether the conduct at issue on its face is within the purview of the arbitration clause.

The Court found that the language of the agreement at issue in the case, "any and all disputes hereunder," limited the parties' duty to arbitrate. All disputes arising *under* the agreement were arbitrable; those that were collateral to the agreement were not. The opinion states further that the function of the Court in dealing with the clause is to ascertain whether any of the methods by which termination may have occurred was dependent on the construction or effect of terms of the contract.

The Court noted that there were three methods for possible termination of the contract in question: (1) a termination in accordance with the duration clause; (2) a termination by a separate agreement; and (3) repudiation by the Union. Under the evidence in that case, it was possible to find that all three methods of termination were operable; however, they were to be treated differently by the Courts. With respect to the question of termination in accordance with the duration clause, the issue in *Rochdale* was whether the letter of termination sent by the employer was received by the Union within the period required by the contract for notice of termination. The Court held at 1296:

> The questions as to when the notice period began, and whether the Rochdale letter constituted compliance with the duration provision are questions arising "under" the collective bargaining agreement. They depend on the construction

**6.** SECTION 1—DURATION. This Agreement shall be binding upon the respective parties effective September 3, 1977, to and including September 1, 1980, and shall be considered as renewed from year to year, thereafter, unless either party hereto shall give written notice to the other of its desire to modify, amend, or terminate same. Any such notice must be given by the party desiring to modify, amend, or terminate the Agreement, at least sixty (60) calendar days prior to the expiration date, but

not more than ninety (90) calendar days prior to the expiration date. In the event such notice is given, and only in such event, negotiations for a new Agreement shall commence within ten (10) days after the date on which such notice is received by the other party, hereto. If such notice shall not be given, the Agreement shall be deemed to be renewed for the succeeding year. Drywall Contractors Master Agreement, p. 3.

or effect of the duration clause, and the dispute as to whether termination occurred in this manner falls within the scope of the arbitration clause. Thus, if termination did not occur by a means that was collateral to the agreement, this dispute was properly submitted to the arbitrator.

The Court held with respect to the other two possible methods of termination, that the second was not subject to arbitration and the third was.

For the purposes of the case at bar, the *Rochdale* decision with respect to the first method of termination is applicable, although this case is distinguishable on the facts. The language of the grievance procedure section [7] of the Drywall agreement is broad in that it requires that procedure to be followed to settle *any* grievance between the parties. The arbitration section,[8] however, contains the language "The decision of the Board of Arbitration shall be limited to matters relating to the agreement." Reading those two provisions together, the quoted language from the arbitration clause is a limitation on the nature of grievances that may be arbitrated. The power of the arbitration board is limited to matters arising "under the contract."

There is no question that the June 20, 1980 letter came within the time constraints of the Drywall agreement and was notice of Defendant's desire to modify and amend. The only question is whether that letter related to the GCLA agreement, the drywall agreement or both. That requires interpretation of the letter *not* a term of the agreement. That question is not a question "under the contract" but is a collateral question and is not arbitrable. Therefore, whether or not the Drywall agreement was terminated by the June 20 letter is for this Court to decide.

Plaintiff had two agreements with the Defendant. Both agreements terminated on the same date, and both were automatically renewed in the absence of written notice. The GCLA agreement covers all contractors who are members of the General Contractors Labor Association. Plaintiff is a member of the Association. As a result of that membership, Plaintiff is subject to and enjoys the benefits of the agreement without having in fact executed it. On the other hand, the coverage of the Drywall agreement is limited to members of the Gypsum Drywall Contractors of Hawaii and any contractors who *become signatory thereto.* Plaintiff is an associate member of the Gypsum Contractors of Hawaii and became a signator of the Drywall contract by executing a certification of receipt and acceptance on July 5, 1979. All negotiations for the GCLA agreement are handled by GCLA and the Employers Council. The

---

7. SECTION 25—GRIEVANCE PROCEDURE. The following procedure will be followed to settle any grievances between the Contractor and the Union:

Step 1. Within sixty (60) days of the date of the grievance, the steward or Business Agent and the Contractor will try to settle the grievance. If the steward or Business Agent and the Contractor are unable to settle the grievance, said grievance will be submitted in writing, within ten (10) days, thereafter, to the Joint Industry Committee.

Any other provisions to the contrary notwithstanding, the steward or the Business Agent may submit the grievance directly to the Joint Industry Committee.

Step 2. If the Joint Industry Committee is unable to settle the grievance within fifteen (15) days after receiving the grievance, the grievance will be submitted within ten (10) days thereafter to arbitration as provided hereinafter. Drywall Contractors Master Agreement, p. 15.

8. SECTION 26—ARBITRATION. There shall be a board of arbitration consisting of three persons, one selected by the Contractors, one selected by the Union, and the third member (hereinafter "independent arbitrator") selected jointly by the two selected representatives. If the two selected representatives cannot agree upon the third arbitrator, he shall be selected by the Chief Justice of the Supreme Court of Hawaii. The decision of the board of arbitration shall be limited to matters relating to the Agreement. The board of arbitration shall not amend the Agreement. The decision of the board of arbitration shall be final and binding upon the parties and shall be in writing, and signed by each member of the board. A copy of the decision shall be given to each party. All fees and expenses of the independent arbitrator shall be borne equally by the Union and the Contractor involved. Each party shall bear the expenses for the presentation of its own case. Drywall Contractors Master Agreement, p. 15.

contractor and the Union do not become directly involved head-to-head, as it were, in the negotiating process. By becoming a signator to the Drywall agreement, Plaintiff certified acceptance of its terms and provisions, although it was negotiated by the Drywall Contractors. In order to become a signator, it was necessary for Plaintiff to deal directly with Defendant. This was an agreement *directly* with the Union. The *only* bargaining agreement in effect on June 20, 1980, directly *between* Plaintiff and Defendant was the Drywall agreement. Plaintiff could not consider that the letter was limited to the GCLA agreement since in fact there was no such agreement *between* the Plaintiff and the Defendant except through the GCLA.

█ The weight of the evidence is that the letter applied to both master agreements, but that, if it can be construed to apply to only one agreement, then it must apply only to the Drywall agreement since, as stated, that was the only agreement *between* Plaintiff and Defendant. Upon receipt of that letter, Plaintiff was obligated to contact Defendants for the purpose of negotiating a new agreement. Under the terms of the duration provision of the Drywall agreement, since no new agreement was negotiated, the agreement was in fact terminated. Defendant's refusal to refer men was not in violation of the agreement.

While Defendant continued to refer men to Plaintiff and accepted contributions to the various union welfare funds from Plaintiff, it is a common practice in the field of labor management relations for the parties to an expired or terminated agreement to continue operating under its terms until a new arrangement is effected.

*IT IS THEREFORE ORDERED* that the requests for preliminary and permanent injunctions are *DENIED*.