**GELCO EXPRESS CORPORATION and Insurance Company of North America, Appellants,**

v.

**R. Richard ASHBY, Respondent.**

**No. WD 35955.**

Missouri Court of Appeals, Western District.

April 9, 1985.

*Inc.,* 595 S.W.2d 26, 28–29 (Mo.App.1980).

**2.** *Detroit Tool & Engineering Co. v. Martin,* 641 S.W.2d 177, 179 (Mo.App.1982); *Meyer v. Vinson,* 448 S.W.2d 316, 317–18 (Mo.App.1969).

Paul Scott Kelly, Jr. and Linda V. Gill, Kansas City (Gage & Tucker, Kansas City, of counsel), for appellants.

Paul E. Vardeman, Kansas City (Polsinelli, White & Vardeman, Kansas City, of counsel), for respondent.

Before PRITCHARD, P.J., and SHANGLER and DIXON, JJ.

PRITCHARD, Presiding Judge.

This is a suit by Gelco Express Corporation to enjoin respondent Ashby from competing with Gelco in its business as an intrastate courier of time-sensitive documents and small packages which are required to be delivered by specific deadlines, usually less than 24 hours from the time of pickup.

The trial court, having issued ex parte a temporary restraining order, dissolved it; denied a preliminary injunction; and entered judgment against Gelco on its claim for permanent injunction; and for Ashby on his counterclaim for damages against Gelco and Insurance Company of North America on the temporary restraining order bond for $12,469.55, and $14,583.97 for Ashby against Gelco for severance pay and other post-termination benefits.

Ashby had been employed by Gelco, or its predecessor companies, including Bankers Dispatch, for 22 years. In the fall of 1982, Ashby became dissatisfied with the manner in which Gelco was being run by upper management, and an employment contract was negotiated, effective February 1, 1983, which provided for a "term" of employment for the entire period of Ashby's employment and 24 months thereafter; an initial period of one year from February 1, 1983 to January 31, 1984, was provided; and this clause (the applicability of which is in controversy) was included: "1. (d) This one year period of employment shall automatically be renewed on its anniversary date for an additional one (1) year period on the same terms and conditions contained herein, unless notice in writing is given by either party of its intention to terminate or renegotiate the terms and conditions hereof, not less than thirty (30) days prior to said anniversary date." Paragraph 3 provided for a covenant of Ashby not to compete during the term (24 months) with any of the types of businesses in which Gelco was engaged [transportation of time-sensitive and non-time sensitive commodities by motor carrier, aircraft and forwarding pursuant to operating authority granted by appropriate government regulatory agencies and/or in accordance with applicable law] within the territory, which was defined to be within the states of Kansas, Missouri and Nebraska. Ashby's title was that of Senior Regional Manager for the territory, at an annual base salary of $50,000, plus such increases and bonuses as may be granted by the company.

Ashby's territory was always profitable. In the 1983 fiscal year, Gelco had a net loss of over 7 million dollars on gross sales of about 70 million dollars, while Ashby's territory produced 3 million dollars profit on 15 million dollars in sales. Ashby was "an excellent businessman" with his own aggressive management style.

Ashby thought that things had not improved with Gelco during 1983, and on October 12, 1983, he wrote a letter to Andrew Grossman, Gelco's president, requesting renegotiation of his employment contract, saying: "The reason I am giving an early notification, as the agreement specifies not less than thirty days, is that I feel it will take more than just the thirty days for us to really discuss the terms and make a decision. In the event that we cannot reach an agreement, then you should have more than just the thirty days to determine my replacement." On December 20, 1983, Ashby wrote a letter to Grossman stating that he did not wish to renew the contract on its expiration date, January 31, 1984. Pursuant to a telephone conversation with Grossman, that letter was withdrawn by Ashby by letter of January 3, 1984, in which he reiterated the necessity of negotiating the terms of the contract and referring to his October, 1983, correspondence.

On October 28, 1983, Gelco signed a contract with Baker Industries, Inc., by which Gelco agreed to sell all of its stock to Baker for 27.5 million. The contract was subject to the approval of the United States Department of Justice, and the Interstate Commerce Commission. An assignment of Ashby's contract of employment was specifically included, as was a provision that Gelco had not and would not terminate any of its employees without the prior consent of Baker or its designee. At the time of the contract, Baker had a wholly owned subsidiary known as Pony Express Courier Corporation which was engaged in the same business as Gelco but in a different part of the United States. Baker then sent a management team, headed by Bob Moree, from Pony Express, to Gelco to become acquainted with the latter's operation. Moree was to become president of both Gelco and Pony Express, and he designated Drew Naber for vice president in charge of a twenty-state territory including Ashby's region. Ashby learned of the Baker-Gelco contract through reading the Wall Street Journal, and he had no function in the mechanics of the take-over. The Baker-Gelco contract was closed February 1, 1984.

Grossman never did respond to Ashby's October 12, 1983, letter requesting renegotiation, and Grossman entered into no meaningful negotiations with Ashby regarding his contract even though he advised Ashby that he was to deal with Gelco. Ashby tried to talk to his supervisor, Gallagher, but was told by him that Grossman and senior vice president, Milovic, would be the ones responsible for negotiating with Ashby. In apparent frustration, Ashby, on November 15, 1983, sent Gallagher a list of demands for the renewal of his contract, to "get something going" and to protect himself from any adverse consequences of the Baker-Pony Express acquisition of Gelco. Gallagher never responded to the list of demands, but sent it on to Grossman and Milovic, neither of whom ever instructed him as to Ashby's demands.

Ashby attended a meeting of key management field personnel in Minneapolis in early November, 1983, at which time he was told by Moree that nothing could be done about his employment contract because Pony Express did not own the company (Gelco). Shortly thereafter, Moree met with Ashby during a tour of 10 or 12 field offices. Ashby then raised the matter of his employment contract and Moree responded that Pony Express would be more definitive about contract discussions at an appropriate time. On November 18, 1983, Ashby wrote Moree again requesting renegotiation of his employment contract. Later in the month, Moree telephoned Ashby and told him that he ought to accept the contract as is and that perhaps the negotiation deadline could be extended past the contract's January 31, 1984, expiration date. Moree told Ashby that he could not sit down and work anything out regarding the contract until the "appropriate time", which in Moree's mind was in late January after ICC's approval of the sale of Gelco's stock. According to Ashby, Moree told him that if he did not accept the contract as is, he was "liable to be whittling all day and scratching crap with the chickens all night."

A few days after Ashby withdrew his resignation, at a breakfast meeting in Denver on January 6, 1984, Naber told Ashby that he was not well-versed with his employment contract situation and that he would talk to Moree about it. On the previous night, Moree told Ashby that he should talk to Naber about the employment contract. Eleven days later, in a car ride from Lincoln to Omaha, shared by Naber and Ashby, nothing developed with respect to contract discussions. Naber testified that Ashby refused to provide him with any demands, and Naber was unaware of the November 15, 1983, demand by letter to Pat Gallagher whom he did not know. Ashby did ask Naber what "you are going to offer, and we'll get together much quicker." Naber did tell him that he was almost sure that Ashby could be kept at the same salary, but he might have to take a little pay cut. Ashby told him, "Well, I am not taking a cut in pay, so there is not really anything we are going to talk about on that line." Ashby expected a salary increase, ordinarily granted by Gelco, of 8 to 10 per cent on February 1, 1984.

On January 23, 1984, Moree wrote Ashby rejecting his demands made in a phone call to Naber a few days before, but offering to consider extending the contract renegotiation deadline for three months. There was no counterproposal to Ashby's salary and employment demands.

On January 26, 1984, Ashby sent a memorandum to all personnel of Gelco stating that January 31, 1984 would be his last day with the company. On January 31, 1984, Ashby and Naber met to discuss the transition of the Kansas City office, at which there was no mention of renegotiation of the contract. At the conclusion of the meeting, Ashby gave Naber his office keys, company car, company credit cards and other company property, and left the office at 3:30 or 4:00 p.m., being driven home by another Gelco employee. A going-away party that evening was given Ashby by employees who had worked for him.

At about 11:00 a.m., on January 31, 1984, Moree gave Erickson, Gelco's executive vice president, a list of about 80 persons who were to be taken off the payroll the next day (to make it clear the action was that of the new management). Ashby's name was on the list, put there according to Moree because his contract was to expire at 12:00 p.m., on January 31, therefore he was to be taken off the payroll. Moree testified that Ashby was on the list because he had resigned. At about 5:00 p.m., on January 31, Gallagher called Ashby and told him he had bad news, that Ashby had just been fired, and told him he would receive severance pay over the next four months.

Ashby testified that he viewed Moree's letter of January 23, 1984, as very confusing because Moree had told him that his contract could not be negotiated because Pony Express did not yet own the company (Gelco), but all of a sudden (on January 23), Moree was willing to do something even though (Pony Express) did not own the company. Ashby believed that the offer to extend negotiations for three months was a stopgap to keep him on the job while Pony Express found a replacement for him; his best "bargaining" interest was not to accept the extension in the hope that there would be immediate negotiations; and that even after leaving work on January 31, 1984, and turning over company property, Pony Express would still make an offer. Gallagher testified that Ashby believed that he would still be able to negotiate the contract right up to the last minute and several months beyond February 1, 1984. Gallagher termed Ashby's actions in writing Gelco's personnel announcing January 31, 1984 as his last day as "vintage Ashby-isms". "When he did not get something that he felt was his due, he was very strong in the way that he—he vocalized that. * * * They were one of many dozens of letters and notes and cryptic comments I would get from Mr. Ashby over the course of business. That was just Mr. Ashby's management style. We all just came to accept it and kind of overlook it."

Moree admitted (and the trial court found) that he kept Ashby on the hook

without serious negotiations saying, "[w]e'll talk at some appropriate time" through November, December, and until January 27 (1984). Moree's letter of January 23, 1984, rejecting Ashby's proposed terms, offering no counterproposal and threatening to sue on the non-compete clause was the extent of the good faith negotiations with Ashby. There is no question but that Moree prepared the list of employees for Erickson to remove from the payroll as of February 1, 1984. Ashby's name was on that list. "A. * * * but the intent of the request was that he take this list and insure that those people were not on the payroll as of January—excuse me— February 1, 1984. Q. In common language that means to fire them, doesn't it? A. Termination, fire, can—you know, you name it. Q. Pink slip them? A. Sure, that's exactly right."

■ What is at issue is whether Gelco breached the contract, causing its termination, in such a manner as to relieve Ashby of performance of his covenant not to compete after termination. As noted, the parties agreed that the employment contract would automatically be renewed *unless* either party gave not less than 30 days notice in writing of intention to terminate *or* renegotiate the terms and conditions. The two alternatives are plain and unambiguous. Although Ashby asserts that the conditions of automatic renewal are ambiguous and should be construed against Gelco, he points to no reason why or wherein it is ambiguous, i.e. susceptible to different meanings. This court may not create an ambiguity where none exists. *John Deere Company v. Hensley,* 527 S.W.2d 363, 365[2] (Mo. banc 1975).

Of course there was no notice specifically to terminate the contract given by either party prior to 30 days before the expiration of the term. But what Ashby did was unequivocally to give official notice that he wished to renegotiate the terms and conditions of the contract. The reason he gave for early negotiations was that he felt that it would take more than thirty days to discuss the terms and make a decision, and he wound up by stating, "In the event that we cannot reach an agreement, then you should have more than just the thirty days to determine my replacement." Thus, Ashby must be held to have known the possibility that the employment agreement would not be renegotiated into a new contract beginning February 1, 1984, and the former contract would then be at an end. His action in giving all personnel notice that January 31, 1984, would be his last day at Gelco, and his turning in of his keys and other company property to Naber, both done after Moree's letter of January 23, 1984, rejecting his demands, is a recognition by Ashby that his contract of employment was at an end.

■ Although involving application of federal labor relations statutes in collective bargaining cases, wherein there is a statutory duty of good faith in renegotiation of labor contracts, 29 U.S.C. § 158(d); 48 Am. Jur.2d, Labor and Labor Relations, § 1027, p. 827, these cases hold that where a labor union gives notice of modification of an automatically renewable contract, the notice terminates the contract. *East Bay U. of Mach., Local 1304 v. Fibreboard Paper Prod. Corp.,* 285 F.Supp. 282, 289[10, 11] (U.S.D.C.N.D.Calif.1968); *Dillingham Corp. v. United Broth. of Carpenters,* 519 F.Supp. 734, 739[2] (U.S.D.C.Hawaii, 1981); *Baker v. Fleet Maintenance, Incorporated,* 409 F.2d 551, 554[3] (C.A.7th 1969); *Kaufman, Etc. v. Intern. Broth. of Firemen,* 607 F.2d 1104, 1109[5] (C.A.5th 1979); and see Anno. 57 A.L.R.Fed. 393. Compare also Chapter 295, RSMo 1978, relating to good faith collective bargaining in utility company labor disputes. There is no requirement of negotiation of a private employment contract such as the one here, nor is there one of "good faith" negotiation. Compare *Mo. Public Service Co. v. Peabody Coal Co.,* 583 S.W.2d 721, 725[2] (Mo. App.1979), holding that Public Service's refusal to accede to Peabody's demand for

coal price increase did not constitute bad faith, the contract having been settled as a result of arm's length dealing with no cloud of dishonesty, lack of good faith or failure to adhere to standard business or commercial practice on the part of either party. See also *La. Power & Light v. Allegheny Ludlum Industries*, 517 F.Supp. 1319, 1329 (U.S.D.C.E.D.La.1981), holding that Allegheny's allegation of LP & L's bad faith in refusing to meet with it in a timely fashion to discuss renegotiation of the contract was without merit in that "There is no obligation imposed under law which would have required LP & L to engage in renegotiation or even discuss renegotiation of its contract with Allegheny." The Uniform Commercial Code imposes only an obligation of good faith on the performance or enforcement of contracts thereunder. Section 400.1–203 RSMo 1978. That would refer only to the existent one year contract between Gelco and Ashby, not to any negotiation of a new contract.

■ It must be remembered that Gelco was under a contract to have its stock purchased by Baker Industries and its subsidiary, Pony Express, which was to be closed February 1, 1984. Ashby was aware of the contract from having read about it in the Wall Street Journal. Moree, who was engaged in the mechanics of the takeover, advised Ashby that his contract would be discussed at a more appropriate later time, which was reasonable under the requirements of the takeover contract, so keeping Ashby "on the hook" under his existent contract, without renegotiating a new contract for the ensuing year, is without legal significance and it shows no bad faith. Finally, Moree's letter of January 23, rejecting Ashby's demands, stated as reasons that they "included not only a substantial increase in compensation, but a reduction in the scope of responsibilities from that which you have today, it is my feeling that we are too far apart for there to be any further meaningful conversations

on this subject at this time." The letter went on to state that based upon prior notices given by Ashby to Gelco, Moree understood that January 31, 1984, would be his last day of employment. The letter went on with this offer: "In the event that you would wish to remain employed with Gelco Express, upon the same terms as are set forth in the Agreement, for an interim term of three months in order to allow us to pursue this further, I would consider it. However, your interest in doing so must be communicated to me in writing not later than January 27, 1984." Ashby did not make that communication.

Ashby contends that Gelco terminated his contract on January 31, 1984, without 30 days notice which constituted its breach of the contract. However, if the direction by Moree to remove Ashby from the payroll effective February 1, 1984, was a termination, it could amount to no more than a recognition that Ashby had already signified the contract termination by his notice to renegotiate in accordance with its plain terms, as above set forth. Gelco could not terminate a relationship which had already been unequivocally terminated by Ashby. *Baker v. Missouri National Life Insurance Company*, 372 S.W.2d 147, 152[3, 4] (Mo.App.1963).

■ Ashby asserts that the covenant not to compete is an overbroad, unlawful restraint of trade and Gelco failed to establish a legitimate need for its enforcement as required by Missouri law. The territory defined by the contract includes the states of Kansas, Missouri and Nebraska, in which Ashby was employed as Senior Regional Manager, and in which the evidence shows that he was very successful in producing a substantial profit for Gelco. By rumors, Gelco became aware that Ashby had gone to work for a direct competitor, Central Air Charter, after he left Gelco's employment. On February 10, 1984, Gelco obtained a temporary restraining order which restrained Ashby from violating the covenant not to compete. That restraining

order was dissolved on March 5, 1984. Thereafter, Ashby acknowledged, through answers to interrogatories on April 9, 1984, that he was employed by Central Air Charter as executive vice president, with the same job description which he had previously with Gelco, except for aircraft maintenance. He further answered that the services or duties he was performing under the arrangement involved contact with customers or potential customers in Kansas and Missouri, and that customers were those of Gelco; that he had, since March 5, 1984, personally, with one Jerry Lawson, contacted customers in Kansas whom he knew to be customers of Gelco for the purposes of soliciting their business for Central Air Charter or any related company, listing six banks in the Wichita-Hutchison-Salina cities, and the Centerre Bank of St. Louis. He stated that Central Air Charter was handling a brand new air run for the Fourth National and National Banks of Salina, which was never Gelco's business.

It is true, as Ashby argues, that Gelco did not establish that it had any real protectible secrets as to trade routes or rates. In fact, Ashby testified that trade route use is available to any competitor in the courier business, and rates are also highly competitive since the Kansas Corporation Commission deregulated the courier business in that state. There is, however, one element listed in *Grebing v. First National Bank of Cape Girardeau*, 613 S.W.2d 872, 874 (Mo.App.1981), as a protectible business interest: *customer lists*, to which should be added *customer contacts* under *Herrington v. Hall*, 624 S.W.2d 148, 151[1, 2] (Mo.App.1981), and cases cited at page 152[4] of that opinion. See also *Orchard Container Corp. v. Orchard*, 601 S.W.2d 299 (Mo.App. 1980), where a three-year limitation on competition, but with a reduced radius of 125 miles where the employer had solicited business was held to be reasonable; and *Chemical Fireproofing Corp. v. Bronska*, 542 S.W.2d 74 (Mo.App.1976), where the employee had built up goodwill for the employer in a two-state area, which was held to be a legitimate protectible interest from the employee, Bronska. Note also the there cited cases, page 80, of *Mills v. Murray*, 472 S.W.2d 6 (Mo.App.1971); and *House of Tools and Engineering, Inc. v. Price*, 504 S.W.2d 157 (Mo.App.1973).

Naber testified for Gelco that Ashby, by reason of being in the business for twenty-some years, knew virtually all the customers of any size of Gelco, and which accounts are critical for it to maintain. He knew how much customers were paying Gelco and (in competition) he could go to them and say that he was going to save them money, and "with his reputation in the business, he's going to have credibility that he can provide the service." In addition to his admissions that he had solicited and obtained some customers of Gelco, he addressed a letter, "Dear Kansas Banker" on Central Air Charter's letterhead, dated March 9, 1984, soliciting business for its air-ground route system, "just streamlined for your bank work." Because the competition imposed by Ashby's new employer, Central Air Charter, was within Gelco's territory as restricted by the covenant not to compete, it certainly had a legitimate protectible interest, and under the facts here, it must be held to be reasonable. There is no evidence that Gelco was guilty of any fraudulent or illegal acts so as to support the trial court's finding that it had unclean hands. See *Hyde Park Amusement Co. v. Mogler*, 358 Mo. 336, 214 S.W.2d 541, 544[3] (1948).

■ Gelco posted a $7,000 bond at the time it received its temporary restraining order on February 10, 1984, that matter being ex parte. On a hearing as to whether Gelco should be granted a preliminary injunction on February 24 and 25, 1984, at which all parties were present and evidence received, the trial court took the matter under advisement, and subsequently denied the application for preliminary injunction and dissolved the temporary restraining order on March 5, 1984. Ashby filed a motion to increase the temporary restraining

order bond which was served on Gelco's counsel March 13, 1984, which motion recites that a motion to increase the bond was made at the close of the hearing on the preliminary injunction, and the record so shows together with the fact that the trial court took the motion to increase bond under advisement. .Near the close of the trial, the court heard evidence of damages by reason of the issuance of the temporary restraining order, consisting of Ashby's lost wages of $2,516.60, and incurrence of attorney fees of $9,952.95, both items being limited in proof to claimed damages from February 10, 1984 to March 1, 1984. On May 18, 1984, the trial court entered judgment denying the petition for permanent injunction; for $14,583.97 on Ashby's counterclaim; and assessed damages of $12,-469.55 on the temporary restraining order bond against Gelco and Insurance Company of North America. On that same date, the trial court increased the amount of the temporary restraining order bond to $13,-000, which Gelco says it was not empowered to do. The trial court, another judge sitting for Division 6, had approved the $7,000 bond, and the temporary restraining order was ordered effective until the application for preliminary injunction was heard.

Rule 92.02(c) provides that "No injunction or temporary restraining order, unless on final hearing or judgment, shall issue in any case, * * * until the plaintiff, or some responsible person for him, shall have executed a bond with sufficient surety or sureties to the other party, in such sum as the court shall deem sufficient to secure the amount or other matter to be enjoined, and all damages that may be occasioned by such injunction or temporary restraining order to the parties enjoined, * * * conditioned that the plaintiff will abide by the decision which shall be made thereon, and may all sums of money, damages and costs that shall be adjudged against him if the injunction or temporary restraining order shall be dissolved. * * * ." The $7,000 bond, which was approved, must have been

*then* considered to have been sufficient by the trial court. There is nothing in the rule or in the cases cited which would prevent its being increased upon motion timely filed or made while the restraining order was in effect. Ashby made his oral motion to the court on February 25, 1984 (the first time he had opportunity to do so), while the restraining order was in effect at which time the trial court took the motion under advisement, which caused it still to pend. The formal written motion, referring to the oral motion, followed. In *Hamilton v. Hecht*, 299 S.W.2d 577, 580 (Mo.App.1957), the defendants moved for an order to increase the amount of the bond, which was denied. Defendants never thereafter pursued the trial court's denial, and the appellate court held that the issue was abandoned, thus there was no issue presented on appeal as to the claimed error in not increasing the bond. In *R.A. Vorhof Const. Co. v. Black Jack Fire Pro. Dist.*, 454 S.W.2d 588, 595–596 (Mo.App.1970), the initial bond was set at $500. Before final submission and judgment, the bond, as requested, was increased to $2,500. *After* final judgment granting a permanent injunction, defendants filed a motion for additional bond of $4,500 which was denied. The court held the defendants to further proof of damages and costs on the timely filed increase of bond of $2,500. Neither the Hamilton nor Vorhoff cases stand for the proposition that a restraining order bond, upon motion timely filed, may not be increased up to the time of final judgment. In this case, Ashby's loss of wages is not contested. It was conceded that the amount of attorney fees in connection with proceedings to dissolve the temporary restraining order was reasonable. That attorney fees are awardable in proceedings to remove an unlawful restraining order is established. *Terminal Railroad Ass'n. of St. Louis v. Schmidt*, 353 Mo. 79, 182 S.W.2d 79, 84 (1944); *State ex rel. County of Shannon v. Chilton*, 626 S.W.2d 426, 430[10, 12] (Mo.App.1981), citing *Kelder v. Dale*, 313 S.W.2d 59, 61 (Mo.App.1958), but

holding that since no bond was filed, there could be no recovery for attorney fees due to the restraining order. There is no evidence that Ashby violated his covenant not to compete prior to March 1, 1984, and the evidence did show he lost wages and incurred costs for attorney fees and expenses prior to that date totalling $12,469.55. The trial court did not err in increasing the restraining order bond and assessing damages for the total of $12,469.55, especially since Ashby showed, prior to final judgment, that his damages exceeded the original $7,000 bond.

■ The trial court awarded Ashby a net of $14,583.97 as severance pay, finding that he had been fired by Gelco, upon his counterclaim. As above noted, the trial court's finding that Gelco discharged Ashby, especially in view of his October 12, 1983 letter requesting renegotiation which brought about the termination of the automatically renewable contract of employment, and Ashby's further acts in regard to the cessation of the contract, is not supported by substantial evidence. The employment contract provides that in consideration of the covenant not to disclose information and not to compete, in the event Ashby's employment was terminated, Gelco would pay him 50% of his base salary per year, to be paid over 24 months after termination, *so long as the covenants were not breached by him.* Obviously, the trial court did not apply this provision, and it would have been error to do so because the evidence shows that Ashby was in violation of the covenant not to compete after March 5, 1984. What the court did apply was Gelco's Policy and Procedure Guide, the purpose of which is recited to be "To provide a benefit for certain *involuntarily* terminated employees." (Emphasis added.) The policy provides further: "The payment of severance allowance as set forth in the following schedule may be made only when termination of employment is by company action. No severance allowance shall be paid or owing to any employee who: (1) terminated

their employment voluntarily; * * *." Ashby's length of service was over 10 years, so if he had been involuntarily terminated (by company action), he would have been entitled to four months base salary. But the trouble is, as discussed above, he was not involuntarily terminated, but by his own voluntary act in requesting renegotiation of the contract. Under the evidence, the trial court erred in awarding severance pay.

The evidence shows that Ashby could perform these duties for his new employer, Central Air Charter, without breaching his covenant not to compete with Gelco, according to his job description: Responsibility for sales and purchases of aircraft and aircraft parts (listing Central's inventory of aircraft); maintenance of company owned and customer aircraft; responsibility for passenger charter flights; responsibility for shift supervisors, clerical and all other Central Airline administrative people; director of marketing and sales, in areas where Central Airlines operates, or might commence operations in states other than Kansas, Nebraska and Missouri; and "I will not engage in any operation or sales efforts that could be considered in any way as being in any way as being a part of courier business." Ashby, at his age of 55 years, has an economic necessity of continued employment and income, and the aforesaid duties should not be prohibited inasmuch as they do not constitute competition in contacting Gelco's customers, and the same should be excluded from the injunction decree as hereinafter directed.

That part of the judgment assessing damages in favor of Ashby and against Gelco on the temporary restraining order, $12,469.55, is affirmed. That part of the judgment awarding Ashby $14,583.91 as severance pay is reversed. The denial of Gelco's prayer for permanent injunction is reversed, and the case is remanded for entry of an injunction decree prohibiting Ashby from (a) engaging in competition in the courier business with Gelco or any of

its subsidiaries in Kansas, Nebraska and Missouri; (b) from hiring or taking away or causing to be hired or taken away, any of Gelco's employees who were employed by it at any time during the six months preceding January 31, 1984; (c) from acting as a consultant, agent or advisor of any Gelco customer who was such on January 31, 1984, in matters relating to Gelco's courier business; (d) from directly or indirectly soliciting, diverting or taking any of Gelco's customers with whom it did business on January 31, 1984, or which it solicited within six months prior to that date; (e) and from disclosing to any person, firm or corporation information relating to Gelco's operation, including trade secrets, business methods, rates, customer lists and needs or any existing or prospective customers. The decree shall exclude the above referenced duties which Ashby may perform for Central Air Charter which are of a noncompetitive nature, and shall have an expiration date of January 31, 1986, in accordance with the employment contract term. Costs of the appeal shall be divided equally between appellants and respondent.

All concur.