**ASHLAND OIL, INC., Plaintiff–Respondent,**

v.

**Robert T. TUCKER, Defendant–Appellant.**

No. 54557.

Missouri Court of Appeals, Eastern District, Division Three.

March 14, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 12, 1989.

Application to Transfer Denied May 16, 1989.

---

Mary C. Kickham, John Henry Quinn III, Armstrong, Teasdale, Kramer, Vaughan & Schlafly, St. Louis, for plaintiff-respondent.

Summers, Compton, Wells & Hamburg, Catherine S. Gidlow, Jill S. Newman, Clayton, for defendant-appellant.

SIMON, Judge.

Robert T. Tucker, appellant, appeals from a judgment in favor of Ashland Oil, Inc., respondent, enforcing a non-competition service agreement. The trial court found the service agreement to be a valid and enforceable contract and permanently restrained and enjoined Tucker, for the period of one year from his termination with Ashland from, in pertinent part, (a) directly or indirectly obtaining or continuing in the employment of any competitor of Ashland; (b) directly or indirectly soliciting business from any client or customer of Ashland; and (c) directly or indirectly assisting or participating in the employment, solicitation or recruiting of any other employee of Ashland who had worked for Ashland during the period and in the capacity set forth in the agreement. The order limited the restraint to the geographical area of eastern Missouri and southern Illinois. Additionally, the court ordered Ashland to pay Tucker the sum of $5,400 less ordinary payroll tax deductions for accrued vacation and severance pay. The trial court made extensive findings of facts and conclusions of law.

On appeal, Tucker contends that the trial court erred in: (1) enforcing the non-competition service agreement pursuant to Missouri law because Louisiana law applies and prohibits enforcement of the non-competition service agreement; (2) finding that payment of salary and continued employment were sufficient consideration for the non-competition service agreement; and (3) granting injunctive relief enjoining Tucker where Ashland had no legitimate business interest to protect. We affirm.

Our review shall be in accordance with the well established standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976), i.e., the judgment will be affirmed if it is supported by substantial evidence and is not against the weight of the evidence, and the trial court did not erroneously declare or apply the law. We defer to the trial court on matters of credibility. Rule 73.01(c)(2). Further, we view the evidence in a light favorable to the judgment.

Tucker had been working in Texas for KCL Fluids, Inc. (KCL) until 1984 when Ashland acquired KCL. KCL was a supplier of oil field chemicals primarily in the southern United States. KCL became a part of Ashland's Industrial Chemicals and Solvents division (IC & S). Ashland is incorporated in Kentucky, headquartered in Ohio, and is in the business of manufacturing and selling oil related products and chemicals on a nationwide basis. Tucker entered into an employment agreement with Ashland on July 31, 1984, to continue employment with Ashland for three years, working in substantially the same capacity as he had with KCL. Tucker continued to work and reside in Texas.

This employment agreement provided for an annual base salary of $42,800 plus an annual "supplemental compensation" of $10,000. Although the agreement does not say Tucker was subject to reassignment by Ashland, Tucker testified that his understanding was that Ashland could move him anywhere. The employment agreement also provided, in pertinent part:

3. During the term of this Agreement and for a period of one (1) year thereafter, Employee shall not engage in any activity which shall be in direct or indirect conflict with the potassium chloride, custom blending of potassium chloride, and wholesale distribution of other oil field chemicals business of Ashland without prior written consent of Ashland. Further, the one (1) year restriction shall be limited to the geographic area of the states of Texas, New Mexico, Arizona, Louisiana, Kansas, Mississippi, and Oklahoma. If the scope of any restriction contained in this paragraph is too broad to permit enforcement of such restriction to its full extent, then such restriction shall be enforced to the maximum extent permitted by Law and Employee hereby consents and agrees that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction. Employee agrees that competition by him could cause irreparable injury to Ashland.

About a year after Tucker had been working for Ashland in Texas, Tucker received a call from an Ashland superior, Patrick Jayne telling him to report to St. Louis, Missouri on July 19, 1985, to hear plans for a promotion and to meet with his potential new superior, Greg Wright. Jayne told Tucker he did not know to which district he might be transferred but further details would be revealed to him in St. Louis. Tucker met Greg Wright in St. Louis who offered him a position as District Manager in the Baton Rouge district. Tucker accepted the position and then immediately went to Ashland's headquarters in Ohio, for further negotiations and to confirm his acceptance of his promotion. He also received a pay raise of $4,200. Approximately three weeks after Tucker moved to Louisiana, the service agreement was sent to him to be signed. Testimony at trial indicated that the service agreement was a uniform agreement required to be signed by Ashland employees who were being promoted. On August 19, 1985, Tucker signed and returned the service agreement to Ashland. The service agreement in the record does not reflect Ashland's acceptance. However, it is not disputed that Ashland accepted the service agreement.

The August 19, 1985 service agreement provides in pertinent part:

In consideration and as a condition of my employment and the wages or salary to be paid for my services during the term thereof by Ashland Oil, Inc., and affiliated or subsidiary companies (hereinafter collectively referred to as "Ashland"), I do hereby covenant, recognize and agree as follows:

\*    \*    \*    \*    \*    \*

10. In order to protect Ashland's substantial time, money and effort invested in (i) training and development of its employees, (ii) research and development, (iii) technical data, (iv) commercial plans and strategies, (v) product manufacture, marketing, selling and servicing, (vi) the development of goodwill among its customers, and (vii) other legitimate business interests, I [Tucker] will not directly or indirectly, for a period of one (1) year

following the termination of my employment for any reason whatsoever, engage in work or any other activity of the kind performed for Ashland involving products or processes similar to the products or processes with which I worked.

I understand and agree that business solicitation and employment solicitation as described herein shall also be prohibited for one (1) year following the termination of my employment.

I agree not to solicit business from any client or customer of Ashland or any person responsible for referring business to Ashland, for any competitor of Ashland or for my own interests if I should become a competitor of Ashland. This restriction pertaining only to clients, customers or persons or entities who refer clients or customers if I, during the course of my employment for Ashland, have had the responsibility of developing, facilitating, maintaining and/or servicing those clients, customers, or other persons or entities who refer clients or customers.

I agree not to take any action to assist my successor employer or any other entity in employment solicitation or recruiting any other employee who had worked for Ashland during any time period when I worked for Ashland. * * * I understand that damages under this paragraph would be difficult to define and for that reason for each person about whom it is determined I have provided information in violation of this section, liquidated damages in the amount of the salary for one year of that person at Ashland shall be payable by me to Ashland.

Where my job related to sales, the one-year restriction, except for employment solicitation, shall apply only in the territory in which my services were performed during the term of my employment, or if employed more than two years, the two (2) year period immediately prior to termination of my employment.

The service agreement did not set forth a specific place of performance. Initially, Tucker's performance under the service agreement was performed in the Baton Rouge district which is entirely within Louisiana. However, in June, 1986, Tucker was again promoted and transferred to the St. Louis district which encompasses eastern Missouri and southern Illinois. He received another pay raise and later a merit increase, but the record does not indicate the exact amounts. A new service agreement was not executed.

In 1987 Tucker's relationship with his superior and Ashland began to sour. That year the "supplemental compensation" under the July 31, 1984 employment agreement expired resulting in a pay reduction of $833 per month.

On January 9, 1988, Tucker accepted employment with Transchemical Corporation (Transchem) in St. Louis as its Marketing Manager. Transchem is a competitor of Ashland for the same customers and sources of supply in the same area, primarily eastern Missouri and southern Illinois. Transchem, a comparatively small competitor of Ashland nationwide, competes almost exclusively in St. Louis.

On January 10, 1988, Tucker informed Ashland of his resignation effective January 23, 1988, but Ashland elected to treat the resignation as effective immediately. Tucker began work with Transchem in St. Louis on January 11, 1988. On January 14, 1988, Ashland sent a letter to Transchem for the purpose of bringing to its attention the August 19, 1985 service agreement between Ashland and Tucker and to point out that Tucker's employment with Transchem was in apparent violation of that agreement. Ashland requested a response by January 18, 1988 but received none. On January 19, 1988, Ashland petitioned for a temporary restraining order (TRO) to enjoin Tucker from continuing employment with Transchem. The TRO was granted on January 20, 1988. Also on January 19, 1988, Ashland petitioned for permanent injunction and for declaratory relief to uphold the August 19, 1985 service agreement and to enjoin Tucker from working for Transchem. Further facts will be enumerated as the need arises.

In his first point, Tucker contends that the trial court erred in enforcing the non-competition agreement pursuant to Missouri law because Louisiana law should apply since the service agreement was: (a) negotiated in Louisiana; (b) executed in Louisiana; (c) all of Tucker's duties were to be performed within Louisiana; (d) all of the customers assigned to Tucker by Ashland were located in Louisiana; and (e) Tucker intended to continue working in Louisiana for an indefinite period at the time the service agreement was executed.

■ The service agreement of August 19, 1985 does not indicate the law governing its interpretation and enforcement. Our attention has not been directed to any Missouri statute nor are we aware of any statute governing this service agreement. Under such circumstances, we follow the Restatement (Second) of Conflicts of Law (1971) in both contract and tort actions. *National Starch and Chemical Corporation v. Newman*, 577 S.W.2d 99, 102[1] (Mo.App.1979).

Restatement (Second) of Conflicts § 6, Choice-of-Law provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the need of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in determination and application of the law to be applied.

Restatements (Second) of Conflicts § 188 provides, in pertinent part:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6,

(2) In the absence of an effective choice of law by the parties, the contacts to be taken into account in applying the principle of § 6 to determine the law applicable to an issue include:

(a) the place of the contracting;

(b) the place of negotiation of the contract;

(c) the place of performance;

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

Applying these factors, we note: (a) Tucker executed the service agreement in Louisiana. The record does not indicate where Ashland executed the service agreement. However, we assume it was in Ohio, Ashland's headquarter's, where the service agreement was sent; (b) negotiations between Ashland and Tucker took place in Missouri and Ohio; (c) no place of performance was set forth in the agreement. However, reassignment was contemplated by the agreement and the parties and Tucker's performance occurred in Louisiana, Missouri, and Illinois; (d) the location of the subject matter, sales and management, was also in Louisiana, Missouri, and Illinois; (e) since Tucker's transfer to the St. Louis district in June, 1986, Tucker has resided in Missouri. Ashland is incorporated in Kentucky, with its principal office in Ohio and has offices in other states, including St. Louis, Missouri. Transchem is located in Missouri.

■ Here, the circumstances warrant application of Missouri law. In a similar factual situation, our brethren in the Western District, applying the factors of Restatement (Second) of Conflicts § 188, found Missouri to be the state with the most significant contact. In *National Starch*, 577 S.W.2d at 101, Newman was an employee of National Starch as a sales representative in New York. As a condition precedent to employment, he executed an employment agreement which contained a restrictive covenant. Shortly thereafter, Newman was transferred to Georgia and executed another similar employment agreement in Georgia. Later, Newman was promoted to district sales manager centered in Kansas City, Missouri. That district included many midwestern states but Missouri constituted about one-half of Newman's sales in that district. Newman resided in Kansas City, Missouri.

Subsequently, National Starch audited its employment agreements and found Newman's agreement did not reflect his new assignments. He was requested to execute a new agreement but did not. A few months later Newman gave notice of his termination with National Starch. National Starch responded by advising Newman of his post-employment covenant found in the last agreement he had executed in Georgia. However, only a few days after his termination, Newman formed a Missouri limited partnership which sold products in direct competition with National Starch.

The Circuit Court found Georgia to be the state with the most significant contact. Our brethren in the Western District, applying Restatement (Second) of Conflicts § 188, found Missouri to be the state with the most significant contact and reversed. The court determined that no place of employee's performance was delineated in the employment agreement and, at all times, performance and the subject matter of performance was in the states of employee's sales territory. The relative interests of Georgia or New York is slight, if existent at all, and the competition in question bore no relation to Georgia or New York. *Id.* at 104[3].

In the present case, Tucker executed the service agreement in Louisiana and sent it to Ashland in Ohio. Negotiations occurred in Missouri and Ohio and Tucker's performance as District Manager occurred in Louisiana, Missouri and Illinois. Tucker resides in Missouri and Ashland has offices in Missouri. Transchem also has its office in Missouri. The competition sought to be restrained would take place in Missouri. Thus, it is clear that Missouri has the most significant interest in the enforcement of this agreement. The interest of Louisiana is slight in comparison. Tucker's first point is not meritorious.

■ In his second point, Tucker alleges the trial court erred in finding that payment of salary and continued employment were sufficient consideration for the non-competition service agreement where Tucker was not an employee at will and had a previous written employment agreement for a guaranteed salary and employment for a specified term which contained non-competition restrictions.

Prior to the execution of the August 19, 1985 service agreement, on July 31, 1984, Tucker executed a three year term employment agreement with fixed base salary of $42,800 annually, plus an annual supplemental compensation of $10,000. This prior agreement also included a non-competition clause.

Tucker contends that because the parties were under the pre-existing duty of the original employment agreement, continued employment and payment of salary cannot constitute sufficient consideration for the August 19, 1985 service agreement. Thus, the service agreement is unenforceable.

However, when Tucker accepted the transfer to Louisiana, not only was it considered a promotion with added responsibility but he also received a pay increase of $4,200. Later when Tucker was promoted to the St. Louis district he received another pay raise and a merit increase.

Richard Hunter, Ashland's Marketing Manager in Ohio, who has been with Ashland for eighteen years, testified that Tucker's transfers to the Baton Rouge district

and the St. Louis district were considered promotions. Richard Hunter also testified that Tucker's salary increased during his employment with Ashland; initially when he was promoted to the Baton Rouge district and again upon his promotion to the St. Louis district. Tucker also received a merit increase while in the St. Louis district. Hunter also testified that each promotion gave Tucker more authority regarding Ashland's personnel, its records and the sale of its products.

Clearly, promotions, additional responsibility, and pay increases constitute adequate consideration in support of the validity of the service agreement. *Computer Sales International, Inc. v. Collins*, 723 S.W.2d 450, 452[1, 2] (Mo.App.1987). Our review of the record reflects sufficient evidence of adequate consideration of the service agreement. Thus, Tucker's second point is not meritorious.

■ In his third point, Tucker alleges the trial court erred in granting injunctive relief enjoining Tucker from working for Transchem because Ashland had absolutely no legitimate business interest to protect. The purpose of the restriction is to keep the covenanting employee out of a situation in which he might be able to make use of contacts with customers to his former employer's disadvantage. If the covenant is lawful and the opportunity for influencing exists, enforcement is appropriate. *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 75[3] (Mo. banc 1985). It is not necessary for the employer to show that actual damage has occurred, in order to obtain the injunction. *Id.* at 75[4].

In his testimony, Richard Hunter described the duties and responsibilities of Tucker's job as District Manager in Baton Rouge and St. Louis districts and the general type of jobs that Ashland District Managers in the IC & S division perform. "District Managers are responsible for the total operation in there [sic] geography, much like a general manager would be. They are responsible for the sales; they are responsible for the supplies and supply sources; they are responsible for training of the employees that work for them; they

are responsible for the operations, including the plant; they are responsible for the trucks; they are responsible for the purchasing of the products that they re-sell; they are responsible for all of the administrative procedures; they are responsible for forecasting." Forecasting includes reporting on "yearly budgets, profits and sales...." District Managers are also responsible for "strategies within the division, both short-term and long-term, and normally five years." "Strategies" include plans for both marketing and obtaining of supplies in their district.

Hunter, who had at one time been District Manager of the St. Louis district, testified that District Managers, including Tucker, are required to provide monthly reports on customers and competition within their district to their Regional Managers. Hunter, as Tucker's Regional Manager, received these reports from him. These reports are then sent on to Ashland's headquarters in Ohio. Through these reports and his personal knowledge, Hunter established that Transchem was a substantial competitor of Ashland. Tucker also testified that Ashland and Transchem compete for the same customers. Transchem handles a product line very similar to Ashland's and sells to the same customers as Ashland in the St. Louis marketplace. It was Hunter's testimony that Ashland's business interests would be damaged irreparably by Tucker's continued work for Transchem or a similar competitor in the St. Louis district because of the knowledge and training Ashland gave Tucker concerning the St. Louis marketplace and the goodwill or relationships he had established with customers on behalf of Ashland.

Additionally, Patrick Jayne testified that prior to Tucker's leaving Ashland he made an appointment with a supplier of Ashland's, Union Carbide. However, despite his termination of employment with Ashland, Tucker kept the appointment as a Transchem employee on behalf of Transchem. He also brought the president of Transchem with him to introduce him to his contact at Union Carbide. Testimony indi-

cated that suppliers, such as Union Carbide, are a key part of Ashland's business.

William Stovall, Transchem's president, testified that prior to the TRO placed on Tucker, Tucker made two sales for Transchem. One sale was with Camie–Campbell. Camie–Campbell is a supplier of Ashland. Stovall testified it had been at least two years since Camie–Campbell had placed an order with Transchem. Other suppliers and customers of Ashland in the St. Louis district include: Petrolite, Kingsford, Chemsico, Traffic Paint, Critzas, Bradford Supply, Lan Chem, and Sinnett–Elpaco. Tucker testified that since he left Ashland he had contacted Petrolite, Camie–Campbell, Lan Chem, Sinnett–Elpaco, Chemsico and Bradford Supply on behalf of Transchem.

It is clear that Transchem and Ashland are competitors for the same suppliers and customers in the St. Louis district. In the nine day period Tucker worked for Transchem prior to the TRO, he contacted numerous suppliers and customers of Ashland as a Transchem employee. Tucker spent over a year and a half working for Ashland in the St. Louis district, learning the territory, the products, the competition, the customers and suppliers. Clearly, Ashland has a legitimate business expectation to protect. Tucker's third point is not meritorious.

JUDGMENT AFFIRMED.

PUDLOWSKI, C.J., and DOWD, P.J., concur.