**FURNITURE MANUFACTURING CORP.**
d/b/a Fixtures Furniture, Appellant,

v.

**Michael L. JOSEPH, Peter J. Raskis and
JR Associates, Inc., Respondent.**

**No. WD 49577.**

Missouri Court of Appeals,
Western District.

May 30, 1995.

Leonard B. Rose, Kansas City, for appellant.

James M. Yeretsky, Kansas City, for respondent.

Before SPINDEN, P.J., and ULRICH and SMART, JJ.

SMART, Judge.

Furniture Manufacturing Corporation, d/b/a Fixtures Furniture ("Fixtures"), appeals from a denial of a preliminary injunction and an order dissolving a temporary restraining order against respondents Michael L. Joseph, Peter J. Raskis, and JR Associates, Inc. (all respondents will be col-

lectively referred to herein as "JR"). Fixtures contends that the trial court erred in dissolving the TRO and in failing to grant a preliminary injunction by: (1) holding that Fixtures failed to show a substantial probability of irreparable harm such as would justify an injunction; and (2) applying a balancing of hardship tests weighing against the issuance of an injunction.

### Background Facts

Fixtures is a Kansas City, Missouri manufacturer of commercial tables and chairs. Fixtures has approximately 40 manufacturer's representatives operating throughout the United States and Canada. Michael L. Joseph is a former employer of Fixtures who became an independent manufacturer's representative in 1983, representing Fixtures and Nemschoff, a manufacturer of wood furniture for hospitals and student unions. On June 1, 1983, Fixtures and Joseph entered into a "Manufacturing Representative Agreement" ("Agreement") containing the following provisions:

4. *Duties.* Company hereby agrees that Manufacturers Representative is to act as Company's Manufacturers Representative to sell the goods manufactured by Company only in the territory particularly defined in the map attached. Manufacturers Representative agrees to endeavor, to the best of his ability to devote not less than 30% [this figure is crossed out and 70% is written in the margin] of his sales time to such representation of the Company and without prior written consent of the Company not to represent for other companies or offer for himself the solicitation of orders for or the sale of any items of the same nature or of similar agreement. Manufacturers Representative further agrees that he will not, without prior written consent of the Company, which shall not be arbitrarily refused, (a) devote more than 10% of his sales time to represent for other companies or offer for himself the solicitation of orders for the sale of any items in any territory other than that as defined in the map attached, or (b) take on any more lines to represent than those already established as per the effective date of this agreement. . . .

9. *Restrictive Covenant.* As a further inducement and consideration to Company to enter into this Agreement, Manufacturers Representative shall not, for a period of one year upon termination for any reason whatsoever, whether as a Manufacturers Representative, employee, officer, director, shareholder, or consultant, work in any administrative or supervisory capacity or sales in any manner whatsoever with any company directly or indirect [sic] competitive with the business of Company in the same territory served during this agreement.

10. *Termination of Agreement.* Either party may terminate this agreement on two weeks written notice to the other. The Company may terminate this agreement for cause at any time without prior notice to Manufacturers Representative. . . .

19. *Right to Injunction or Restraining Order.* Manufacturers Representative hereby acknowledges that violation of the terms of this agreement by him with respect to his obligations under certain paragraphs of this agreement, including but not limited to paragraph 4 with respect to duties ... would result in irreparable harm and damage to the Company not adequately compensable by money damage, and he agrees that in the event of such violation of any term of this agreement that the Company may, in its absolute discretion, seek injunctive relief including exparte temporary restraining order in order to avoid such irreparable harm. . . .

In March, 1988 Joseph was joined by Peter J. Raskis. Joseph and Raskis formed JR Associates, Inc. Both men signed separate, identical amendments to the June 1, 1983 Agreement dated November 11, 1988 signifying their agreement to be bound by the terms of the agreement. Since 1988, the range of manufacturers represented by JR has broadened considerably. By 1994, JR's sales of Fixtures products consisted of well below fifty percent of JR's total sales.

In the fall of 1993, William Gapske, a sales manager with Fixtures, was told by Joseph

that JR was handling a line called Sitag. Joseph told Gapske that JR was selling lounge furniture, a line which would not be competitive with Fixtures. Joseph did not tell Gapske that JR's representation of Sitag also included ergonomic seating which competed with Fixtures' ergonomic seating. Neither Joseph nor Raskis asked permission to handle the line, either orally or in writing. The disclosure report submitted by JR, although listing Sitag, did not disclose the fact that Sitag was competitive in ergonomic seating, but instead showed Sitag's product line as "conference room chairs, lounge chairs, sofas."

Fixtures maintains a list of major competitors for the purpose of helping identify major competitors. The list is not exhaustive, and it is updated from time to time to reflect changes in the state of the market. Sitag was not placed upon the list until after Fixtures investigated JR's involvement with Sitag.

Upon investigation, Gapske discovered that Sitag was a competitor because its products included ergonomic office seating. In January, 1994, Gapske indicated concern to Joseph about JR's continued representation of Sitag. In early February, Fixtures instructed JR to terminate representation of Sitag. On February 15, 1994, Joseph acknowledged in correspondence that JR had not asked permission from Fixtures to represent Sitag. Joseph stated that JR had viewed the decision to represent Sitag as a replacement line for Carolina Seating, a product line which JR had represented in the past. The letter requested that Polsky allow JR to continue to represent Sitag, and requested that Fixtures withdraw its "ultimatum."

Fixture's response, while expressing sympathy at some of the business and personal problems mentioned by Joseph in his letter, stated that nevertheless Fixtures had no choice but to terminate.

I cannot allow Reps to take on lines without our knowledge and especially competitors either on the Major Competitors list or not. The Sitag Eco–Sit is in competition to our discovery original [a Fixtures product] and their Liberty to our discovery passive plus and flair [other Fixtures products]. . . .

JR was then subsequently notified that Fixtures was electing to terminate on two weeks' notice, as provided for by the agreement, to take effect on March 4, 1994. Fixtures reminded JR that JR would continue to be bound, after termination, "by certain terms including, but not limited to, the restrictive covenant, trade secrets, samples and records, confidential information, jurisdiction, and others."

In April, 1994, after Fixtures terminated the relationship with JR, JR also took on the sale of products manufactured by Allsteel. Allsteel had been identified as a major competitor from the inception of the agreement between Joseph and Fixtures. After learning that JR was also representing Allsteel, Fixtures elected to seek a temporary restraining order. Norman Polsky, chairman of Fixtures, stated that he was initially willing to waive enforcement of the restrictive covenant (with regard to JR's representation of Sitag) but that when he found out that JR had also begun to represent Allsteel he decided that Fixtures would seek enforcement of the restrictive covenant.

On May 13, 1994, a hearing was held in the Circuit Court of Jackson County on Fixtures' motion for preliminary injunctive relief. At the conclusion of Fixtures' evidence, JR moved to deny the preliminary injunction and to dissolve the temporary restraining order on grounds that the balance of the equities favored allowing JR to be free from enforcement of the covenants. By order dated May 17, 1994, the circuit court dissolved the temporary restraining order, stating:

[P]laintiff [Fixtures] has failed to show substantial probability of irreparable harm and failed to show that the balance of hardships weighs in favor of [Fixtures] such as would justify the issuance of an injunction against defendants.

JR presented no evidence at the hearing on preliminary relief because the trial court granted JR's motion at the conclusion of the evidence presented by Fixtures. Fixtures' appeal is an appeal only of the dissolution of the TRO and the denial of preliminary in-

junctive relief. *Sua sponte,* we examine the appealability of these rulings.

### Appealability of Trial Court Rulings

■ An appeal will lie from a final decree in an injunction suit; but unless the case comes within some special statutory provision to the contrary, an appeal will not lie from an order granting, denying, or dissolving a preliminary injunction or from any other merely interlocutory order or decree. *Eickelmann v. Eickelmann,* 724 S.W.2d 261, 262 (Mo.App.1986); 4 C.J.S. *Appeal and Error* § 144 (1993). Missouri does have a statutory provision which allows an appeal from any order *dissolving* an injunction. Section 512.020, RSMo 1994. A temporary restraining order has been held to be an injunction within the meaning of this statute, and thus an appeal lies from an order dissolving it. *Perseverance Common School Dist. No. 90 v. Honey,* 367 S.W.2d 243, 246–47 (Mo.App. 1963). Whether the dissolution of the temporary restraining order in this case is appealable requires reference to Rule 92.02(b), which governs the issuance of temporary restraining orders, and the terms of the temporary restraining order itself. Temporary restraining orders, of course, are emergency measures, often issued *ex parte,* where there is a need to protect an applicant from immediate and irreparable injury which may result to the applicant before a formal contested hearing can be scheduled. Rule 92.02(b) provides that a temporary restraining order shall be effective for only ten days unless the court for good cause extends the time or the opposing parties agree to a longer period. In this case, the temporary restraining order specified that it was effective for a period of ten days, or until hearing and determination of the prayer for a preliminary injunction, "whichever is greater." Since the hearing occurred and the ruling was issued *after* the expiration of the ten days authorized by the rule, without any formal extension for good cause, the temporary restraining order had already expired (pursuant to the limit imposed on the court's authority under Rule 92.02(b)), by the time the hearing was con-

ducted. Consequently, the court's decision to dissolve the TRO was not an effective judicial ruling and cannot form the basis of an appealable event. This case is distinguishable from *Perseverance Common School Dist. No. 90 v. Honey,* 367 S.W.2d 243 (Mo.App.1963), where the temporary restraining order did not expire, but was dissolved by court order. Consequently, it appears that no appeal may lie from the expiration of the TRO in this case.

■ The question of whether an appeal may lie from the denial of a preliminary injunction also requires some scrutiny. Ordinarily, orders denying the initial issuance of a preliminary injunction are interlocutory in nature and are therefore not appealable. *Eickelmann v. Eickelmann,* 724 S.W.2d 261 (Mo.App.1986).[1] However, it has also been held that the question whether an order is final and appealable may be decided by the appeals court on a consideration of the substance and effect of the order on the rights of the parties, regardless of the general character of the order. *Hooper v. Wineland,* 131 S.W.2d 232 (Mo.App.1939). Thus, if the practical effect of a dismissal of the appeal would be to deprive the appellant of any equitable relief altogether, the court could determine the denial to be appealable. Here, however, we see no basis for an exception to the rule that the denial of preliminary injunctive relief is not appealable.

### Distinction between Right to Permanent Injunctive Relief and Preliminary Injunctive Relief

■ In the interest of judicial economy, we deem it appropriate to discuss the law applicable to the issue of permanent injunctive relief which will be faced by the trial court on remand. In our view, the parties in this appeal have not maintained a distinction between the issue of entitlement to injunctive relief and the issue of the right to obtain *preliminary* injunctive relief. The analysis applicable to preliminary relief is not identi-

---

1. In the courts of the United States, denials of preliminary injunctions are appealable pursuant to 28 U.S.C. § 1291. A large majority of state

jurisdictions also permit an appeal from an order denying a preliminary injunction. 42 Am.Jur.2d *Injunctions* § 346 (1969).

cal to that applied to the issue of permanent relief after full hearing.

### Right to Injunctive Relief Generally

*Osage Glass, Inc. v. Donovan,* 693 S.W.2d 71 (Mo. banc 1985) involved an employment contract which included a covenant not to compete for a period of three years after the termination of employment. The Missouri Supreme Court held that an employer need not show actual damage in order to be entitled to relief,[2] stating:

> The purpose of the restriction is to keep the covenanting employee out of a situation in which he might be able to make use of contacts with customers to his former employer's disadvantage. If the covenant is lawful and the opportunity for influencing customers exists, enforcement is appropriate.
>
> Nor is it necessary for the employer to show that actual damage has occurred, in order to obtain an injunction. The actual damage might be very hard to determine, and this is one reason for granting equitable relief. The significant circumstance is potential for damage.

*Id.* at 75.

In reaching its decision the court noted that covenants not to compete, formerly considered contrary to public policy, may serve legitimate interests of both employer and employee. *Id.* Of course, while no longer considered contrary to public policy, non-competition agreements still are not favored, and the party seeking enforcement must show that such an agreement is necessary to serve interests which are legally protectible. *Mo–Kan Central Recovery Co. v. Hedenkamp,* 671 S.W.2d 396, 399 (Mo.App.1984). The enforcing party must also show that the agreement is reasonable in scope. *Continental Research Corp. v. Scholz,* 595 S.W.2d 396, 400 (Mo.App.1980).

In the instant case, we are dealing with a contract between a manufacturer and a company desiring special rights to represent that manufacturer in a particular territorial location. Fixtures seeks specific enforcement of the restrictive covenant. The terms of the contract show that the parties contemplated that specific enforcement could be obtained, and that the parties would not be limited to damage remedies. JR has not thus far contended there is anything unreasonable from a business standpoint about the restrictive covenant which Fixtures negotiated in this case. The parties voluntarily entered into the contract in question, and each is held to know its terms and to have agreed to be bound thereby. The parties presumably would have engaged in some "balancing of the equities" themselves in entering into the contract. It is appropriate for the courts to enforce contracts which reasonably protect legitimate business interests. *Ashland Oil, Inc.,* 768 S.W.2d at 601. One such protectible interest is that of customer contacts. *Continental Research,* 595 S.W.2d at 400. It is not necessary to show that actual damage has occurred before an injunction may be obtained. *Ashland Oil, Inc.,* 768 S.W.2d at 601. In Missouri, it appears the primary considerations governing the issuance of specific performance injunctive relief in a case such as this are (1) whether the terms of the contractual provisions protect business interests which are properly entitled to protection, such as trade secrets and customer contacts; and (2) whether the contractual provisions are reasonable in scope, both geographically and temporally. *See, e.g., Osage Glass, Inc. v. Donovan,* 693 S.W.2d 71 (Mo banc 1985); *Continental Research Corp. v. Scholz,* 595 S.W.2d 396 (Mo.App.1980); *Ashland Oil, Inc. v. Tucker,* 768 S.W.2d 595 (Mo.App.1989).

The evidence introduced in connection with the hearing on preliminary relief shows that over the years JR has developed extensive contacts with customers in its assigned territory, which included Colorado, Utah, New Mexico and El Paso, Texas. The evidence

---

**2.** *See also Refrigeration Indus., Inc. v. Nemmers,* 880 S.W.2d 912, 921 (Mo.App.1994) ("Where an employer has a legitimate proprietary interest in his customers and good will, a noncompete agreement will be enforced as to an employee with substantial customer contacts"); *Ashland*

*Oil, Inc. v. Tucker,* 768 S.W.2d 595, 601 (Mo.App. 1989) ("If the covenant is lawful and the opportunity for influencing exists, enforcement is appropriate."); *Nail Boutique, Inc. v. Church,* 758 S.W.2d 206 (Mo.App.1988); *A.B. Chance Co. v. Schmidt,* 719 S.W.2d 854 (Mo.App.1986).

indicates that Joseph and Raskis had relationships with Fixtures' customers which would tend to give them a competitive boost in converting customers of Fixtures' products to other products.

■ JR argues that *Osage Glass* is not applicable, suggesting instead that the proper authority is *Showe–Time Video Rentals, Inc. v. Douglas,* 727 S.W.2d 426 (Mo.App. 1987). That case holds that noncompete covenants contained in contracts which are terminable at will should not be enforced unless termination is in good faith.[3] *Showe–Time* has not been shown to be applicable under the facts of the instant case because in *Showe–Time,* there was no evidence that the defendant had breached any provision of the agreement. Moreover, it appeared that the terms of the agreement were subject to bad faith manipulation. Here, on the other hand, the uncontradicted evidence thus far introduced shows that it was JR which breached the agreement with Fixtures by handling Sitag without prior written consent in violation of the agreement. JR was caught, and then, in essence, sought to renegotiate the contract. Fixtures refused to renegotiate.

Here, there is no contention that the terms of the agreement were unreasonable. JR argues only that the *scope* of the covenant is so broad as to be unenforceable. JR presents no authority, however, for the proposition that broad language excludes enforcement of the covenant as narrowly and reasonably construed. Therefore, the language will be construed as allowing enforcement of only those interests in which Fixtures has a legally protectible interest.

We note also that the restriction contained in the Agreement has not thus far been shown to be unreasonable as to time limit and geographic restriction. The time limit, one year, falls within the limits upheld in prior decisions. For example, in *Mid–States Paint & Chem. Co. v. Herr,* 746 S.W.2d 613, 618 (Mo.App.1988), a two year restriction was held to be reasonable. Similar geographic restrictions have also been deemed reasonable. In *Gelco Express Corp. v. Ash-*

*by,* 689 S.W.2d 790, 795–96 (Mo.App.1985), this court upheld a three state restriction of Missouri, Kansas and Nebraska where the defendant was employed as a senior regional manager in those three states.

### Right to Temporary Injunctive Relief

■ For purposes of *temporary* injunctive relief pending final resolution after a full hearing, however, the trial court was entitled to consider all the factors customarily considered in connection with motions for preliminary injunctive relief. Rule 92.02 does not address the substantive factors to be considered. Section 526.050, RSMo 1994, authorizes preliminary injunction when the failure to grant a preliminary injunction would have the effect of rendering a final judgment for injunctive relief ineffectual. The standard of review for grant of preliminary relief or denial thereof (when appealable) is a review for abuse of discretion, because trial courts are allowed broad discretion as to preliminary injunctive relief. *White v. Boyne,* 224 Mo.App. 597, 30 S.W.2d 791 (1930). The factors to be considered in connection with preliminary relief include some which are in addition to those applicable to permanent injunctive relief. *See, e.g., Farmers Underwriters Association v. Reid,* 425 S.W.2d 247 (Mo.App.1967); *Hill v. Xyquad, Inc.,* 939 F.2d 627 (8th Cir.1991). A plaintiff will sometimes have a stronger case on the merits than it does with regard to preliminary relief. Such plaintiff, therefore, may wish to consolidate a hearing on the merits with the hearing on the motion for preliminary relief, or else move to the merits as soon as possible following an order as to preliminary relief.

### When Injunctive Relief Effective

■ We come now to the issue of mootness, which is the issue of the point at which, if granted, injunctive relief would be effective. In *C.M. Brown and Associates, Inc. v. King,* 680 S.W.2d 365 (Mo.App.1984), the court held that since the period of the restrictive covenant had expired while the case

---

**3.** In Missouri, restrictive covenants can be enforced in employment contracts which can be terminated at will. *See Deck & Decker Personnel*

*Consultants, Ltd. v. Pigg,* 555 S.W.2d 705 (Mo. App.1977); *Reed, Roberts Assocs., Inc. v. Bailenson,* 537 S.W.2d 238 (Mo.App.1976).

was pending on appeal, the appeal had become moot, and the court dismissed the appeal. If *C.M. Brown* is the applicable law in this case, the prayer for injunctive relief is moot. Then not only must the appeal be dismissed, but also any claim for permanent injunctive relief in the trial court must be dismissed. Fixtures argues, however, that in this case the covenant should be enforced for a period of a year from the date the injunctive relief is granted, rather than from the date the agreement is terminated. Fixtures cites *Southwest Pump & Mach. Co. v. Forslund,* 225 Mo.App. 262, 29 S.W.2d 165 (1930) and *Ranch Hand Foods, Inc. v. Polar Pak Foods, Inc.,* 690 S.W.2d 437 (Mo.App. 1985), as cases that provide a strong indication that the restrictive covenant should be tolled pending litigation. In *Southwest Pump,* the trial court ordered a three year injunction to begin on the date the court issued the decree. 29 S.W.2d at 167. The trial court's decision was affirmed upon appeal. *Ranch Hand Foods* contained mixed issues of Kansas and Missouri law. Defendant Lumianski's employment contract carried a two year restriction on competition. *Ranch Hand Foods,* 690 S.W.2d at 439–40. Lumianski was dismissed from the company in June, 1980. *Id.* at 439. The case was decided by this court in March, 1985, well after the two year period had run. This court reversed the trial court's denial of relief on the company's claim. In sending the case back to the trial court, this court noted that the claim for injunctive relief was to be reopened conditionally, depending upon what option the company pursued. *Id.* at 445. By indicating that injunctive relief was available, the court gave tacit approval for fashioning a remedy to run from the date of the decree. To the extent that *C.M. Brown and Associates* conflicts with *Southwest Pump* and *Ranch Hand Foods,* we believe it to be incorrectly decided, and we are persuaded to follow these latter authorities.[4] Therefore, we conclude this case is not moot as to injunctive relief.

The TRO in this case was in effect only briefly. If the trial court, after the parties have presented any further evidence, determines permanent injunctive relief is appropriate, enforcement of the applicable period from the date of the decree would not be inequitable. The trial court may also consider, if relief is to be granted, whether any reduction of the twelve month period of enforcement is appropriate on the basis that Fixtures, by inaction for a period of a month or so, may have waived enforcement of that portion of the restrictive period.

*Conclusion*

Neither the expiration of the temporary restraining order nor the denial of preliminary injunctive relief were appealable. We remand to the trial court for further proceedings in accordance with this opinion. Each party shall bear its own costs on this appeal.

All concur.

---

4. Of course, there may be cases where it is clear that a *particular* designated period of time is significant to the parties, and that once that period has run, no subsequent equivalent period of noncompetition can provide meaningful relief. We do not have information from which to conclude that this is such a case.