# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1441

_____

Emerson Electric Co.,

      Plaintiff - Appellee,

v.

Guy Rogers;  Guy Rogers Sales, Inc.,

      Defendants - Appellants.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the Eastern
\* District of Missouri.
\*
\*
\*

_____

Submitted: June 21, 2005
Filed: August 8, 2005

_____

Before MURPHY, RILEY, and SMITH, Circuit Judges.

_____

MURPHY, Circuit Judge.

Guy Rogers worked as a manufacturer's representative for Emerson Electric Co. (Emerson), selling its ceiling fans to retailers in the southeast.  When he left Emerson to begin selling the  fans of a competitor, Minka Lighting Company, Emerson filed this lawsuit, alleging that Rogers misappropriated trade secrets and violated the covenant not to compete in their Sales Representation Agreement.  The district court[1] granted Emerson's motion for a preliminary injunction, and Rogers appeals.  We affirm.

_____

[1]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

Guyan T. Rogers has worked as a manufacturer's representative for various manufacturers since 1969. As a manufacturer's representative, Rogers markets and sells products to retailers who then market the products to the general public. He is currently the president and sole shareholder of Guy Rogers Sales, Inc., an incorporated entity that represents lighting and fan manufacturers to retailers in Georgia, Alabama, Tennessee, and Florida. The company pays three independent contractors to serve as representatives, and Rogers himself continues to visit and make sales calls to customers on a regular basis. He is presently 69 years old.

Rogers started selling Emerson's ceiling fans in 1988, and he began selling Minka lighting products in 1987. Minka became his largest account, generating approximately three million dollars annually in gross sales and $200,000 in annual commissions. When Minka started manufacturing fans in 1994, it attempted to persuade Rogers to sell its fans instead of Emerson's, but Rogers declined. Before leaving Emerson in the fall of 2004, Rogers was selling approximately one million dollars annually of its ceiling fan products, generating approximately $50,000 in annual commissions.

Emerson first asked Rogers to sign a covenant not to compete in 1997 and then asked him to sign another copy of the covenant in 1999. In their standard Sales Representation Agreement, which contained the entire covenant, the parties acknowledged that "customer relationships can often be difficult to develop and require a significant investment of time and effort." Emerson agreed to engage and compensate Rogers based upon his promise "not to divert [its] customer contacts, loyalty and goodwill." If the parties were to end their relationship, Emerson "would need certain protections to prevent its competitors from gaining an unfair competitive advantage," loss of its goodwill, and misuse of proprietary information. By entering into the agreement, Rogers would be obliged not to sell competitive products for a period of one year after their relationship ended and during that period he would not:

(a) in the Territory, enter the employment of, or act as a sales representative, manufacturer's representative or agent for, any person or entity which is engaged in the manufacture, supply or sale of ceiling fans and accessories . . . which are competitive with those products manufactured, supplied or sold by Manufacturer ("Competitive Product"), or

(b) sell or provide any Competitive Product to any Customer with whom Sales Representative dealt, for which Sales Representative was responsible, or with respect to which Sales Representative was provided or had access to Confidential Information . . . .

In the fall of 2004, Rogers terminated his relationship with Emerson. He believed Minka was going to hire a new representative to represent its lighting products unless he agreed to discontinue his relationship with Emerson and begin to sell Minka's ceiling fans. On October 11 Rogers sent his resignation to Emerson to be effective November 1, 2004; the letter was dated October 1, 2004. Rogers also called his supervisor, Ed Springer, and informed him of his decision to leave Emerson and to begin selling Minka fans. Springer did not warn Rogers that he was contractually bound to wait one year before he began working for Minka or remind Rogers of any other contractual obligations after he left Emerson.

Rogers took measures contrary to Emerson's interests almost immediately after he terminated his relationship with it. After giving Emerson his resignation, Rogers visited his contacts at Georgia Lighting. Georgia Lighting has been a valuable customer for both Rogers and Emerson; it has been one of Rogers' top two accounts and one of Emerson's top five national accounts. During this visit Rogers talked with Roxanne Todd and Mary Hardy, who influence the types and quantities of fan products purchased by Georgia Lighting. He told them that he was leaving Emerson and would be representing Minka's ceiling fan products and would like to continue doing business with them. Rogers did not return any of Emerson's materials until after its attorney sent him a "cease and desist" letter demanding immediate return of all

Emerson materials. Even after he received the letter, Rogers did not return all of the materials; he claims he did not understand the breadth of materials which Emerson deemed confidential.

At the time Rogers left Emerson, the parties suspected that Georgia Lighting was going to go out of business. The district court found that a notice had been circulated that Georgia Lighting would no longer operate its retail stores as of January 25, 2005, and the record indicates that Georgia Lighting is no longer operational. There is evidence that its employees would likely remain in the ceiling fan and home lighting industries, however.

On November 8, 2004, Emerson filed this action in state court, alleging that Rogers had breached his agreement and misappropriated trade secrets under Missouri's Uniform Trade Secrets Act. Emerson sought both monetary and injunctive relief. After Emerson moved for a temporary restraining order and a preliminary injunction, Rogers successfully petitioned to remove the case to federal court. Minka has paid for his defense in this action.

The federal district court granted Emerson's motion for a temporary restraining order and then held two evidentiary hearings before granting Emerson's motion for a preliminary injunction. It also permitted Emerson to amend its pleadings to add Guy Rogers Sales, Inc. as a defendant. The injunction enjoined Guy Rogers and all agents of Guy Rogers Sales, Inc. from engaging in the sale of ceiling fans competitive with those manufactured by Emerson Electric Company for a period of one year from November 1, 2004, in the territory of Georgia, Alabama, and the panhandle of Florida.

Rogers appeals, arguing that the district court abused its discretion when it issued the injunction. Although the injunction only restricts Rogers from selling ceiling fans in competition with Emerson in the defined territory, he maintains that

we should look at the broader language of the covenant which would prevent him and his company from working in any capacity for a competitor of Emerson. He argues that the covenant is unenforceable in any respect because of its breadth. He also argues that the district court should not have barred him from selling ceiling fans to all potential customers in the geographic region, but only to customers of Emerson. Rogers also maintains that the district court erred by applying Missouri law in deciding whether the covenant is enforceable and by issuing an injunction without considering whether to impose a bond.

In determining whether to grant a preliminary injunction a court considers (1) the probability of the movant's success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of the preliminary injunction is in the public interest. See Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). A district court has broad discretion when ruling on preliminary injunction requests, and we will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of discretion. United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998).

In Missouri there are two primary considerations governing the enforceability of covenants not to compete: the parties' agreement must protect well recognized employer interests, and the terms must be reasonable in geographic and temporal scope. Furniture Mfr. Corp. v. Joseph, 900 S.W.2d 642, 647 (Mo. Ct. App. 1995). Emerson argues that its covenant not to compete is necessary to protect its trade secrets and its customer contacts, both of which have been recognized as legitimate employer interests in Missouri. See Armstrong v. Cape Giradeau Physician Assoc., 49 S.W.3d 821,k 825 (Mo. Ct. App. 2001).

Rogers responds, arguing that Emerson is not likely to prevail on the merits because Emerson does not have a cognizable interest in customers he had before he

started to work with Emerson and in customers who had never before purchased Emerson products. He asserts that the parties' agreement can not be enforced because he did not have special influence over Emerson's customers. Since Rogers represented more than one manufacturer at a time, he also argues that customers never associated him with only one manufacturer.

Under Missouri law, covenants not to compete may be enforced, for "an employer has a proprietary right in his stock of customers and their good will." Mills v. Murray, 472 S.W.2d 6, 12 (Mo. Ct. App. 1971). Customer contacts may be protected under a restrictive covenant since sales personnel may "exert a special influence over [a] customer." Zemitsch v. Harrison, 712 S.W.2d 418, 422 (Mo. Ct. App. 1986). "An express agreement not to compete may be enforced as to employees having substantial customer contacts. It is not necessary to show that there is a secret customer list." Osage Glass, Inc. v. Donovan, 693 S.W.2d 71, 75 (Mo. 1985) (en banc).

Although Rogers represented the products of different manufacturers, his success as a representative shows that he has had special influence over Emerson's customers. Emerson's interest in protecting its relationships with customers to whom Rogers sold products prior to his relationship with it is now as important to Emerson as is its ability to sell to new customers. Emerson has a legitimate business interest in restraining Rogers from violating the terms of their agreement by unfairly using the relationships he developed or strengthened while working with it. During the course of Rogers' affiliation with Emerson, he has acquired knowledge regarding its sales practices, pricing strategies, and marketing mechanisms, and Emerson has a legitimate interest in restraining him from using that knowledge in the immediate future to lure away its customers. The district court did not abuse its discretion by finding that the agreement protected a recognizable interest.

Rogers also attempts to argue that he was unaware of the covenant not to compete and that Emerson has failed to enforce the covenant as to other employees

and in other situations. The district court found that while Rogers claimed to be unaware of the covenant not to compete, his testimony was "not believable" because of correspondences between Emerson and Rogers in January of 2003 that explicitly referenced the covenant. This finding is not clearly erroneous, and there is no dispute that Rogers voluntarily signed the agreement and that the covenant was clearly written in the main text of the agreement. While Emerson may not have exercised its rights under the covenant on every occasion, there is no credible evidence that Emerson's failure to do so rose to a waiver of its right to enforce the agreement as to Rogers or that its failure to enforce the agreement as to other employees makes it any less likely that Rogers could use information gained during his relationship with Emerson to unfairly compete against it.

Rogers also maintains that the covenant not to compete is unenforceable because it is unreasonably broad. "The question of reasonableness of a restraint requires a thorough consideration of surrounding circumstances, including the subject matter of the contract, the purpose to be served, the situation of the parties, the extent of the restraint, and the specialization of the business." House of Tools and Eng'g, Inc. v. Price, 504 S.W.2d 157, 159 (Mo. Ct. App. 1973) (internal quotation omitted). The reasonableness of the covenant is determined in light of the specific circumstances present in the case. Washington County Memorial Hospital v. Sidebottom, 7 S.W.3d 542, 545 (Mo. Ct. App. 1999).

The covenant and injunction only apply to the region in which Rogers worked for Emerson and only extend for one year from the time at which Rogers stopped selling Emerson's products. Thus, the restriction in the injunction runs only to November 1, 2005. Although it applies to potential as well as current Emerson customers, the district court heard evidence that Rogers attempted to solicit business from Emerson immediately after he resigned. Georgia Lighting's decision to go out of business illustrates the reasonableness of the restraint at issue. If Georgia Lighting's former employees were to start working for a new entity, the injunction

would not protect Emerson from abuse of the relationship Rogers formed with its customers unless it extended to any customer in the region. The one year restriction will allow Emerson time to employ a new representative who can become acquainted with the territory and the customers before Rogers begins marketing Minka's fans. Since Rogers has a vast amount of knowledge about Emerson's products, sales methods, and pricing strategies, the district court did not abuse its discretion by finding it reasonable to keep Rogers from working for any of Emerson's competitors in any capacity for the limited period.

To show irreparable harm in Missouri an employer need only demonstrate that there is a threat of irreparable harm; the employer is not required to demonstrate that actual damage has occurred. Osage Glass, Inc., 693 S.W.2d at 75. If Rogers were to lure away Emerson's customers and retain them for Minka, it would be difficult to measure the amount of damages caused by the unfair competition and impossible to remedy fully because the consumers could not be forced to purchase Emerson's products.

Finally, Rogers argues that the district court abused its discretion when it found that the harm to Emerson outweighs the potential harm to him and that issuance of the injunction is in the public interest. We disagree. Rogers knowingly and voluntarily agreed to be restricted by the covenant, and any perceived harm to him by the enforcement of the agreement is outweighed by the harm foreseeable to Emerson. As an independent contractor, Rogers worked as a manufacturer's representative for approximately thirty years before he entered into the covenant not to compete. He served as a representative to at least three other companies, and he earned annual commissions larger than those he earned from Emerson from at least two of the other companies. Even with the injunction, he retains the ability to sell lighting products to any customer in the region. He will only be barred from selling fan products for a period of one year from the date he left Emerson, that is until November 1, 2005. Although Rogers submitted an affidavit from Pat Wilson, Minka's Vice President for

Sales, that Minka would hire a new representative to represent all of its products in the territory if Rogers could not represent both its ceiling fan and lighting products, it cannot be said that the district court abused its discretion by enforcing an agreement that only restricts Rogers for one calendar year. By voluntarily signing the agreement, Rogers continued earning commissions from the sale of Emerson products. The district court did not clearly err in finding that the potential harm to Rogers did not outweigh the harm to Emerson if Rogers was permitted to compete against it in contravention of their agreement.

Where there is a legal covenant not to compete, "and the opportunity for influencing customers exists, enforcement is appropriate." Osage Glass, Inc. v. Donovan, 693 S.W.2d at 75. Based on the limited duration of the covenant, Rogers' consent to the covenant, and the risk Emerson will suffer unquantifiable harm, the district court did not abuse its discretion by finding that the public policy of Missouri encouraged the enforcement of the covenant not to compete. See Natl. Starch & Chem. Corp. v. Newman, 577 S.W.2d 99, 104 (Mo. Ct. App. 1978) ("The policy of Missouri is to enforce reasonable restrictive covenants which tend to protect Missouri businesses from unfair competition by former employees.").

Rogers spends a substantial portion of his brief arguing that the law of Georgia rather than Missouri should determine whether the covenant not to compete is enforceable, but counsel did not address the subject at oral argument. The parties agreed in the Standard Sales Agreement that Missouri law would govern any dispute regarding the terms of the agreement, including the covenant not to compete. Rogers' assertion that conflict of law principles dictate that the district court should have applied Georgia law is without merit. Each state has a substantial interest in the validity of the covenant. Even assuming that Missouri were the default state and that a Georgia court would be more likely to find the covenant unenforceable, there is no indication Missouri lacks all interest in the transaction or that Georgia's interest in the dispute is materially greater than that of Missouri. Restatement (Second) Conflict of

-9-

Laws § 187 (1971).  The district court did not err by applying Missouri law to determine whether the injunction should be issued.

Rogers also argues the district court's initial failure to consider imposing a bond requirement on Emerson rendered the injunction invalid under Federal Rule of Civil Procedure 65(c).  Since Emerson has meanwhile posted a bond in the amount of $105,000.00, we need not reach the merits of this contention.[2]

Accordingly, we affirm the preliminary injunction issued by the district court and remand for further proceedings.

_____

---

[2]After oral argument, Emerson filed a motion requesting leave to file a supplemental appendix that evidenced its $105,000.00 bond.  We now grant the motion.